**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| JESSICA BRIGGS, CHRISTOPHER GASTALL, SHANNON MILLER, and DUSTIN OLSON, individually and on behalf of others similarly situated, | Case No.: |
| Plaintiffs, | **CLASS ACTION COMPLAINT** |
| v. | **DEMAND FOR JURY TRIAL** |
| VOLKSWAGEN GROUP OF AMERICA, INC., a New Jersey Corporation, d/b/a VOLKSWAGEN OF AMERICA, INC., and VOLKSWAGEN AG, a German Corporation. | |
| Defendants. | |

Plaintiffs Jessica Briggs, Christopher Gastall, Shannon Miller, and Dustin Olson, individually and on behalf of all others similarly situated, bring this Complaint against Volkswagen Group of America, Inc. d/b/a Volkswagen of America, Inc. and Volkswagen AG (collectively "Defendants" or "Volkswagen"). Plaintiffs allege the following based on: (a) personal knowledge, (b) the investigation of counsel, and (c) information and belief:

## INTRODUCTION

1.      This consumer class action arises from a latent defect found in model year ("MY") 2018-2021 Volkswagen Atlas vehicles (the "Class Vehicles") that were imported and distributed across the United States and Puerto Rico by Volkswagen Group of America, Inc.

2.      This action arises from Defendants' failure, despite its longstanding knowledge since at least November 25, 2018, to disclose to Plaintiffs and other consumers that the Class Vehicles contain a defectively designed and/or manufactured cylinder head and cylinder head

gasket that causes it to prematurely fail ("Cylinder Head Defect" or "Defect"). When the Defect manifests, it can cause the engines in the Class Vehicles to overheat, mix engine coolant and oil, lose power, idle roughly and misfire, and leak engine coolant. If not quickly identified and fixed, the Defect may cause sudden and catastrophic engine failure.

3.      The sudden and unexpected catastrophic engine failure causes the Class Vehicles to unexpectedly stop, posing a danger to the drivers and occupants of the Class Vehicles, and others who share the road with them, as other vehicles can collide with the Class Vehicles after they suddenly stop moving.

4.      Not only did Defendants actively conceal the fact that the Class Vehicles were prone to the Defect, which could result in sudden and unexpected slowing and stopping events and other dangerous situations (and require costly repairs to fix), but they also did not reveal that the existence of this Defect would diminish the intrinsic and resale value of the Class Vehicles.

5.      Defendants have long been aware of the Defect. Despite their longstanding knowledge, Defendants have been unable or unwilling to adequately repair the Class Vehicles when the Defect manifests.

6.      Owners and lessees of the Class Vehicles have communicated with Defendants and their agents to request that they remedy and/or address the Defect at Defendants' expense. Defendants have failed and/or refused to do so, often conveying to owners and lessees that the Class Vehicles are operating as intended and therefore cannot be repaired under warranty or otherwise. Once the Class Vehicles fall outside the warranty period, Defendants charge the owners and lessees for the costly repairs necessitated by the Defect.

7.      Defendants have also refused to take any action to correct this concealed defect when it manifests in the Class Vehicles outside of the warranty period. Because the Defect can

manifest shortly outside of the warranty period for the Class Vehicles — and given Defendants' knowledge of this concealed, safety-related defect — Defendants' attempt to limit the warranty with respect to the Cylinder Head Defect is unconscionable and unenforceable here.

8.      As a result of Defendants' unfair, deceptive, and/or fraudulent business practices, owners and/or lessees of the Class Vehicles, including Plaintiffs, have suffered an ascertainable loss of money and/or property and/or loss in value. The unfair and deceptive trade practices committed by Defendants were conducted in a manner giving rise to substantial aggravating circumstances.

9.      Despite notice and knowledge of the Defect from the numerous complaints they have received, information received from dealers, National Highway Traffic Safety Administration ("NHTSA") complaints, and their own internal records, including pre-sale durability testing, Defendants have not recalled and/or offered an adequate repair to the Class Vehicles, offered their customers suitable repairs or replacements free of charge, or offered to reimburse their customers who have incurred out-of-pocket expenses to repair the Defect.

10.      Had Plaintiffs and other Class Members known of the Defect at the time of purchase or lease, they would not have bought or leased the Class Vehicles, or would have paid substantially less for them.

11.      Plaintiffs are also informed and believe, and on that basis allege, that as the number of complaints increased, and Class Members grew dissatisfied with the performance of the Class Vehicles, Defendants were forced to acknowledge that the Class Vehicles suffer from an inherent defect.

12.      As a result of the Defect and the monetary costs associated with attempting to repair the Defect, Plaintiffs and the Class Members have suffered injury in fact, incurred damages, and

have otherwise been harmed by Defendants' conduct.

13.     This case seeks protection and relief for owners and lessees of the Class Vehicles for the harm they have suffered, and the safety risks they face, from Defendants' breaches of express and implied warranties and Defendants' unfair, unlawful, and deceptive trade practices.

## JURISDICTION AND VENUE

14.     This Court has subject matter jurisdiction of this action pursuant to 28 U.S.C. § 1332 of the Class Action Fairness Act of 2005 because: (i) there are 100 or more class members, (ii) there is an aggregate amount in controversy exceeding $5,000,000, exclusive of interest and costs, and (iii) there is minimal diversity because at least one Plaintiffs and one defendant are citizens of different states.  This Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

15.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391 because Defendants transact business in this district, are subject to personal jurisdiction in this district, and therefore are deemed to be citizens of this district. Additionally, a substantial part of the events or omissions giving rise to the claims occurred in this district, Defendants have advertised in this district, and Defendants have received substantial revenue and profits from their sales and/or leasing of Class Vehicles in this district.

16.     This Court has personal jurisdiction over Defendants because they have conducted substantial business in this judicial district, and intentionally and purposefully placed Class Vehicles into the stream of commerce within the state of New Jersey and throughout the United States.

///

///

## THE PARTIES

**Plaintiff Jessica Briggs**

17.     Plaintiff Jessica Briggs is a citizen and resident of Virginia.

18.     Plaintiff Briggs purchased a new 2018 Volkswagen Atlas in November 2018 from Lindsay Volkswagen, an authorized Volkswagen dealership located in Sterling, Virginia.

19.     Plaintiff Briggs purchased (and still owns) this vehicle, which is used for personal, and/or household use. Her vehicle contains a 3.6L FSI engine. Her vehicle bears Vehicle Identification Number: 1V2MR2CA3JC596307.

20.     Prior to purchase, Plaintiff Briggs discussed the features of the vehicle with Volkswagen's sales representatives at Lindsay Volkswagen, researched Volkswagen vehicles online, specifically on Volkswagen's website, test drove the vehicle, and reviewed the vehicle's window sticker. None of these sources disclosed the Defect to Plaintiff Briggs.

21.     On or around February 1, 2023, when Plaintiff Briggs' vehicle had approximately 64,952 miles on the odometer, she received a "low engine coolant" alert. She topped off the coolant, which caused the alert to disappear. Approximately one week later, the alert reappeared. She brought her vehicle to Lindsay Volkswagen. Lindsay diagnosed a water pump leak and recommended a coolant pump replacement. Lindsay performed the necessary repair under the Class Vehicle's warranty.

22.     On or around August 7, 2023, when Plaintiff Briggs' vehicle had approximately 72,137 miles on the odometer, Plaintiff Briggs brought her vehicle to Lindsay Volkswagen for what she suspected may be another coolant leak. Lindsay inspected the vehicle and found a warped cylinder head and recommended a cylinder head gasket replacement. Due to labor and part shortages, Lindsay was not able to perform the repairs until September 7, 2023.

23.     On or around September 2024, when Plaintiff Briggs' vehicle had approximately

86,000 miles on the odometer, Plaintiff Briggs brought her vehicle to Lindsay Volkswagen for what she believed to be a leak based on her previous experiences and service visits. Lindsay diagnosed an oil leak coming from the front of the engine, between the cylinder head to the cylinder block. Lindsay recommended a cylinder head gasket replacement. Lindsay informed Plaintiff Briggs that she would be required to pay for the cylinder head gasket replacement herself because the repairs would not be covered under warranty.

24.     Plaintiff Briggs submitted a request to Volkswagen's Customer CARE to cover the costs of the necessary repair due to repeated cylinder head gasket failures in her vehicle. Volkswagen Customer CARE informed Plaintiff Briggs that it would only partially cover the costs of the necessary repair.

25.     Because Plaintiff Briggs needed a safe and working vehicle, she paid approximately $800 for the necessary repairs.

26.     Plaintiff Briggs has suffered an ascertainable loss as a result of Defendants' omissions and/or misrepresentations associated with the Defect, including, but not limited to, out-of-pocket loss associated with the Defect, diminished value of her vehicle, and other consequential damages.

27.     Neither Defendants, nor any of their agents, dealers, or other representatives informed Plaintiff Briggs of the existence of the Cylinder Head Defect prior to purchase. Had Defendants disclosed the Defect to Plaintiff Briggs, she would not have purchased her Class Vehicle, or would have paid less for it.

**Plaintiff Christopher Gastall**

28.     Plaintiff Christopher Gastall is a citizen and resident of Rhode Island.

29.     Plaintiff Gastall purchased a new 2021 Volkswagen Atlas in October 2021 from

Volkswagen of North Attleboro, an authorized Volkswagen dealership located in North Attleboro, Massachusetts.

30.     Plaintiff Gastall purchased (and still owns) this vehicle, which is used for personal, and/or household use. His vehicle contains a 3.6L FSI engine. His vehicle bears Vehicle Identification Number: 1V2KR2CA8MC608429.

31.     Prior to purchase, Plaintiff Gastall discussed the features of the vehicle with Volkswagen's sales representatives at Volkswagen of North Attleboro, researched the Atlas online, test drove the vehicle, and reviewed the vehicle's window sticker. None of these sources disclosed the Defect to Plaintiff Gastall.

32.     On or around August 2024, when Plaintiff Gastall's vehicle had approximately 53,560 miles on the odometer, he brought his vehicle to Speedcraft Volkswagen, an authorized Volkswagen dealership located in Wakefield, Rhode Island. Speedcraft diagnosed a cylinder head gasket failure and recommended replacement. Speedcraft informed Plaintiff Gastall that he would be required to pay for the necessary repair because it would not be covered under the Class Vehicle's warranty.

33.     Plaintiff Gastall submitted a request to Volkswagen's Customer CARE to cover the costs of the necessary repair. Volkswagen Customer CARE informed Plaintiff Gastall that it would only partially cover the costs of the necessary repair.

34.     Because Plaintiff Gastall needed a safe and working vehicle, he paid approximately $313.37 out-of-pocket for the necessary repairs.

35.     Plaintiff Gastall has suffered an ascertainable loss as a result of Defendants' omissions and/or misrepresentations associated with the Defect, including, but not limited to, out-of-pocket loss associated with the Defect, diminished value of his vehicle, and other consequential

damages.

36.     Neither Defendants, nor any of their agents, dealers, or other representatives informed Plaintiff Gastall of the existence of the Cylinder Head Defect prior to purchase. Had Defendants disclosed the Defect to Plaintiff Gastall, he would not have purchased his Class Vehicle, or would have paid less for it.

**Plaintiff Shannon Miller**

37.     Plaintiff Shannon Miller is a citizen and resident of Wisconsin.

38.     Plaintiff Miller purchased a new 2021 Volkswagen Atlas in May 2021 from Volkswagen of Eau Claire, an authorized Volkswagen dealership located in Eau Claire, Wisconsin.

39.     Plaintiff Miller purchased (and still owns) this vehicle, which is used for personal, and/or household use. His vehicle contains a 3.6L FSI engine. His vehicle bears Vehicle Identification Number: 1V2TE2CA0MC228839.

40.     Prior to purchase, Plaintiff Miller discussed the features of the vehicle with Volkswagen's sales representatives at Volkswagen of Eau Claire and reviewed the vehicle's window sticker. None of these sources disclosed the Defect to Plaintiff Miller.

41.     On or around February 28, 2024, when Plaintiff Miller's vehicle had approximately 52,000 miles on the odometer, he received a "low engine coolant" alert on his dashboard. This came as a surprise because Plaintiff Miller receives monthly "health reports" for his vehicle and none of these reports identified any issues with the engine, transmission, and/or powertrain components. Plaintiff Miller scheduled an appointment with Morrie's Audi Volkswagen, an authorized Volkswagen dealership located in Onalaska, Wisconsin.

42.     On February 29, 2024, Plaintiff Miller brought his vehicle to Morrie's. Morrie's confirmed that Plaintiff Miller's vehicle was leaking coolant. Morrie's informed Plaintiff Miller

that it was possible that some of the coolant may have evaporated. Morrie's topped off the engine coolant, and recommended that Plaintiff Miller perform a low coolant diagnosis, and replace the serpentine belt and crankshaft seal at Plaintiff Miller's expense to address the purported coolant leak issues. Plaintiff Miller declined the repairs so that he could further understand the low coolant issues and obtain a second opinion.

43.    On or around March 7, 2024, Plaintiff Miller received another "low engine coolant" alert. Plaintiff Miller turned off the car and the alert disappeared. This pattern continued for approximately one week.

44.    On or around March 25, 2024, when Plaintiff Miller's vehicle had approximately 55,000 miles on the odometer, Plaintiff Miller brought his vehicle to Morrie's where he reported the continuous problems with the "low engine coolant" alert. Morrie's diagnosed a cylinder head gasket failure. Morrie's recommended a cylinder head gasket replacement. Morrie's informed Plaintiff Miller that he would be required to pay for the cylinder head gasket replacement himself because the repairs would not be covered under the Class Vehicle's warranty.

45.    Plaintiff Miller needed a safe and working vehicle, so he paid approximately $3,500 out-of-pocket for the necessary repairs.

46.    Plaintiff Miller contacted Volkswagen's Customer Care department to request a reimbursement. Volkswagen denied Plaintiff Miller's request.

47.    Plaintiff Miller has suffered an ascertainable loss as a result of Defendants' omissions and/or misrepresentations associated with the Defect, including, but not limited to, out-of-pocket loss associated with the Defect, diminished value of his vehicle, and other consequential damages.

48.    Neither Defendants, nor any of their agents, dealers, or other representatives

informed Plaintiff Miller of the existence of the Cylinder Head Defect prior to purchase. Had Defendants disclosed the Defect to Plaintiff Miller, he would not have purchased his Class Vehicle, or would have paid less for it.

**Plaintiff Dustin Olson**

49.    Plaintiff Dustin Olson is a citizen and resident of Utah.

50.    Plaintiff Olson purchased a new 2018 Volkswagen Atlas in June 2018 from Pohanka Volkswagen, an authorized Volkswagen dealership located in Capitol Heights, Maryland.

51.    Plaintiff Olson purchased (and still owns) this vehicle, which is used for personal, and/or household use. His vehicle contains a 3.6L FSI engine. His vehicle bears Vehicle Identification Number: 1V2MR2CA8JC560693.

52.    At the time of purchase, Plaintiff Olson purchased an extended warranty from VWFS Protection Services, Inc., a service protection plan offered by Volkswagen, to cover certain repairs for 10 years or 150,000 miles, whichever comes first.

53.    Prior to purchase, Plaintiff Olson discussed the features of the vehicle with Volkswagen's sales representatives at Pohanka Volkswagen, researched the Atlas online, test drove the vehicle, and reviewed the vehicle's window sticker. None of these sources disclosed the Defect to Plaintiff Olson.

54.    On or around November 11, 2019, when Plaintiff Olson's vehicle had approximately 28,719 miles on the odometer, Plaintiff Olson received a "low coolant" warning on his vehicle's dashboard. Plaintiff Olson brought his vehicle to Pohanka Volkswagen. Pohanka diagnosed a cylinder head gasket failure and recommended replacement. Pohanka performed the necessary repair under the Class Vehicle's warranty.

55.    On or around September 28, 2021, when Plaintiff Olson's vehicle had

approximately 62,919 miles on the odometer, Plaintiff Olson noticed that his vehicle was again losing coolant. Plaintiff Olson brought his vehicle to Young Volkswagen, an authorized Volkswagen dealership located in Layton, Utah. Young diagnosed a coolant loss in the cylinder head and recommended a cylinder head gasket replacement. Young performed the necessary repair under the Class Vehicle's warranty.

56.    On or around October 14, 2022, when Plaintiff Olson's vehicle had approximately 86,477 miles on the odometer, Plaintiff Olson again noticed that the coolant in his vehicle was low. Plaintiff Olson brought his vehicle to Young Volkswagen, who diagnosed another cylinder head gasket failure and recommended replacement. Young performed the necessary repair under Plaintiff Olson's extended warranty. Plaintiff Olson was required to pay a deductible in the amount of $135.93.

57.    On or around April 5, 2023, when Plaintiff Olson's vehicle had approximately 101,498 miles on the odometer, Plaintiff Olson again noticed a "low coolant" warning on his vehicle's dashboard. Plaintiff Olson brought his vehicle to Young Volkswagen and reported the coolant issues. Young observed coolant leaking and that the water pump was leaking and recommended a water pump replacement. Young performed the necessary repair under Plaintiff Olson's extended warranty. Plaintiff Olson was required to pay a deductible in the amount of $289.15.

58.    On or around July 29, 2024, when Plaintiff Olson's vehicle had approximately 128,170 miles on the odometer, Plaintiff Olson again observed a "low coolant" alert. Plaintiff Olson brought his vehicle to Young Volkswagen, where they found coolant leaking from the cylinders. Young Volkswagen's authorized mechanics informed Plaintiff Olson that the issues with Plaintiff Olson's vehicle are "known problems" and that Volkswagen has not provided a

remedy or provided updated, non-defective parts to replace defective head gaskets. Young recommended a cylinder head gasket replacement. Young performed the necessary repair under Plaintiff Olson's extended warranty on or around August 13, 2024. Plaintiff Olson was required to pay a deductible in the amount of $146.21.

59.    In addition to the deductibles Plaintiff Olson was required to pay, Plaintiff Olson was also required to pay for a rental car while waiting for his vehicle to be repaired on one occasion.

60.    Plaintiff Olson has suffered an ascertainable loss as a result of Defendants' omissions and/or misrepresentations associated with the Defect, including, but not limited to, out-of-pocket loss associated with the Defect, diminished value of his vehicle, and other consequential damages.

61.    Neither Defendants, nor any of their agents, dealers, or other representatives informed Plaintiff Olson of the existence of the Cylinder Head Defect prior to purchase. Had Defendants disclosed the Defect to Plaintiff Olson, he would not have purchased his Class Vehicle, or would have paid less for it.

**Defendants**

62.    Defendant Volkswagen Group of America, Inc. ("Volkswagen of America") is a New Jersey corporation with its principal place of business located at 2200 Ferdinand Porsche Drive, Herndon, Virginia 20171.

63.    Defendant Volkswagen Group of America, Inc. is a "wholly owned subsidiary of Volkswagen AG, one of the world's leading automobile manufacturers and the largest carmaker in Europe."[1]

_____

[1] http://www.volkswagengroupofamerica.com/about (last visited February 28, 2025).

64.    Volkswagen AG ("VWAG") is headquartered in Wolfsburg, Germany.

65.    Defendants manufacture, distribute, market, service, repair, sell, and lease passenger vehicles, including the Class Vehicles.

66.    At all times material to this Complaint, Defendants have advertised, marketed, offered for sale, sold, offered for lease, leased, and distributed motor vehicles, including the Class Vehicles, to consumers in Maryland, Massachusetts, New Jersey, Virginia, Wisconsin, as well as throughout the United States.

67.    Upon information and belief, the design, manufacture, distribution, service, repair, modification, installation and decisions regarding the Class Vehicles were performed exclusively by Defendants.

68.    Upon information and belief, Defendants develop the owners' manuals, warranty booklets and information included in maintenance recommendations and/or schedules for the Class Vehicles.

69.    Defendants engage in continuous and substantial business in Maryland, Massachusetts, New Jersey, Wisconsin, Virginia, as well as throughout the United States.

70.    Volkswagen Group of America, Inc. is a duly organized New Jersey corporation with a principal place of business at 2200 Woodland Pointe Ave, Herndon, Virginia 20171. VWAG is the parent of Volkswagen of America. Volkswagen of America manufactures, imports, distributes and/or sells Volkswagen motor vehicles including the Class Vehicles, and also acts as the authorized representative of VWAG in the United States. Volkswagen of America drafted and published the owner's manual and USA Warranty and Maintenance manual that accompanied Class Vehicles and acted, and continues to act, as the warrantor of vehicles constructed by VWAG and Volkswagen of America that are sold in the United States. At all relevant times, Volkswagen

of America acted as an authorized agent, representative, servant, employee, and/or alter ego of VWAG performing activities concerning but not limited to advertising, warranties, warranty repairs, dissemination of technical information, and monitoring the performance of Volkswagen vehicles in the United States, including substantial activities that occurred within this jurisdiction. VWAG is the parent company of Volkswagen of America.

## TOLLING OF STATUTES OF LIMITATION

71. Any applicable statute(s) of limitations has been tolled by Defendants' knowing and active concealment and denial of the facts alleged herein. Plaintiffs and members of the Class could not have reasonably discovered the true, latent nature of the Defect until shortly before this class action litigation was commenced.

72. Defendants were and remain under a continuing duty to disclose to Plaintiffs and members of the Class the true character, quality, and nature of the Class Vehicles, that the Defect is a safety-related defect, and that it diminishes the resale value of the Class Vehicles. As a result of the active concealment by Defendants, any and all applicable statutes of limitations otherwise applicable to the allegations herein have been tolled.

## FACTUAL ALLEGATIONS

### A. The Head Gasket in the Class Vehicles

73. The cylinder head and head gasket are vital components for reliable engine operation and performance. The head gasket is a sealing component made from a range of materials, including steel, copper, and Elastomer.

74. As the below diagram illustrates, the head gasket contained in the Class Vehicles is located between the cylinder head and the engine block. The cylinder head forms the top of the combustion chamber while also housing the intake and exhaust ports. The head gasket prevents

engine fluids from leaking and thereby maintaining proper compression within the combustion chambers by separating the coolant from the engine oil; essentially acting as a barrier to ensure the engine operates efficiently. The engine block houses the main rotating assembly of the internal engine.



75.    VW engines installed in the Class Vehicles use reciprocating pistons to convert the pressure created by the combustion of gasoline mixed with air into a rotating motion. To generate such rotating motion, a four-step sequence (the "Combustion Cycle") is used. First, the intake stroke begins with the inlet valve opening and an atomized fuel mixture is pulled into the combustion chamber. Second, the compression stroke begins with the inlet valve closing and the piston beginning its movement upward, compressing the air in the combustion chamber. Third, the power stroke begins when the spark plug ignites the fuel/air mixture, expanding the gases and generating power that is transmitted to the crankshaft. Fourth, the exhaust stroke begins with the exhaust valve opening and the piston moving up, pushing the exhaust gases out of the cylinder.

The exhaust valve then closes, the inlet valve opens, and the Combustion Cycle repeats itself. A diagram of the Combustion Cycle is below:



76. During this process, engine oil is used to lubricate the piston, piston rings, and the cylinder wall as the piston moves up and down. Engine oil reduces wear on moving parts throughout the engine, improves sealing, and cools the engine by carrying heat away from the moving parts.

77. The Combustion Cycle creates significant heat within the engine, engine surfaces and components. The Class Vehicles, like most modern automobiles with combustion engines, utilize a liquid engine cooling system to dissipate heat generated by the engine while the Class Vehicles are in operation. Without a properly functioning engine cooling system, the engines in the Class Vehicles will overheat, which will eventually result in catastrophic engine failure, which poses a substantial safety threat to Class Vehicle owners and their families.

78. The head gasket is used to seal the space between the cylinder head and the cylinder.

It works to seal the internal combustion chamber, composed of fuel and air that are burned inside the chamber, which allows coolant and oil to travel throughout the engine to cool and lubricate it.

79. By sealing the internal combustion chamber, the head gasket helps the fuel ignition process to run smoothly, allowing the Class Vehicles to generate enough power to propel the vehicle forward.

80. Additionally, the head gasket prevents harmful gases from exiting the combustion chamber by directing them through the exhaust system.

81. Because the engine uses three different fluids (fuel, engine coolant, and oil), the head gasket works to ensure these fluids do not mix.

82. When a head gasket loses integrity and the seal is compromised, engine coolant and engine oil can mix as they penetrate the combustion chamber and impair the combustion cycle, foul spark plugs, create higher emissions and contaminate the engine oil, oiling system and cooling system.

**B.  The Cylinder Head and Cylinder Head Defect**

83. The head gasket and cylinder head in the Class Vehicles contain a design, materials, and/or manufacturing defect that leads to premature failure.

84. When the Defect manifests, the head gasket is unable to seal the combustion chamber, causing the engine to overheat. Further, the head gasket is unable to prevent engine coolant and engine oil from mixing.

85. As a result of the Cylinder Head Defect, Class Members may experience a slew of problems, including coolant leaking under the exhaust manifold, discolored exhaust smoke, fouled spark plugs, low engine oil, contaminated engine oil, radiator bubbling, loss of power, and engine overheating.

86.    Even worse, sometimes a head gasket failure shows no symptoms at all, and continuing to drive a vehicle with a bad head gasket is extremely hazardous to the engine and can lead to catastrophic engine failure.

87.    The Class Vehicles have a 3.6-liter six-cylinder VR6 engine is a direct-injection engine that utilizes a crossflow aluminum-alloy cylinder head design, twin overhead camshafts, four valves per cylinder, and variable valve timing.[2]

88.    The engine contained in the Class Vehicles is compact. Volkswagen also reduced engine weight by reducing the number of crankshaft counterweights from eight to four. Internal friction is reduced due to measures such as roller bearings for the engine's balancer shafts and a reduction in the size of the engine's main bearings.

89.    The exhaust headers are integrated directly into the cylinder head to optimize the system coolant operation (facilitating rapid warm-up, which helps improve efficiency), and allow greater thermal management of the exhaust stream.

90.    Unfortunately, the materials utilized by Defendants in the design and manufacturing of the head gaskets and cylinder head contained in the Class Vehicles are entirely inadequate and thus prone to premature failure and cracking.

91.    After cracks form in the head gasket, hot engine coolant leaks under the exhaust manifold. Further, the cracks are unable to prevent hot engine oil and coolant from mixing and leaking. Once the hot engine coolant leaks, it prevents the engine from operating at an optimal temperature thereby causing the engine to overheat.

92.    Additionally, the Cylinder Head Defect reduces the amount of engine coolant in the

---

[2] https://media.vw.com/en-us/releases/857 (last visited February 28, 2025); https://media.vw.com/assets/documents/original/11353-2021AtlasTechSpecsFINAL.pdf (last visited February 28, 2025).

system, eventually resulting in a loss of all coolant in the Class Vehicles. Engine coolant prevents the engines from freezing in cold weather and overheating in warm weather. A loss of engine coolant further impairs the Class Vehicles' ability to regulate the temperature of the engines.

93.     According to a Volkswagen service technician, diagnosing and repairing head gaskets is difficult due to the location of the head gasket and other parts, as described below. Specifically, when a head gasket fails, it does not show up on pressure testers and leaks cannot be seen dripping on the floor.

94.     In order to diagnose a head gasket failure, technicians need to remove other parts, including the intake system, valve cover, ignition coils, spark plugs, timing chain and cylinder head to be able to access the combustion chamber, as illustrated further below:



95.     Once there, technicians use a boroscope to observe the internal head gasket for leaks.

96.     The below photos depict evidence of coolant leaking into the cylinder head. The pistons are discolored to a pinkish color from the pink coolant:[3]



---

[3] https://www.springfieldvw.com/topics/2019-atlas-head-gasket-3-6l/ (last visited February 28, 2025); https://www.tiktok.com/@dtccisco352/video/7063974699574906159 (last visited February 28, 2025)





97.    The head gaskets in the Class Vehicles are not maintenance items and should last for the life of the Class Vehicles. Plaintiffs' experiences, as well as the experiences of the Class, demonstrate that the head gaskets fail well before the end of the useful life of the Class Vehicles.

### C. Defendants' Knowledge of the Cylinder Head Defect

98.    Upon information and belief, Defendants regularly monitor the NHTSA databases as part of their ongoing obligation to identify potential defects in their vehicles. Examples of complaints about Class Vehicles can be found below. NHTSA complaints establish that Defendants knew, or should have known, of the Defect *at least* as early as November 25, 2018, based on publicly-available information through: (1) Defendants' own records of customers' complaints, (2) dealership repair records, (3) records from NHTSA, (4) warranty and post-warranty claims, (5) pre-sale durability testing and part sales, and/or (6) other various sources.

99.    Defendants tout their quality efforts in its 2022 annual report:

Around the world, our commercial vehicles business also prides itself on products of quality and on customer focus. Our range of trucks, buses and engines is complemented by services that aim to guarantee fuel efficiency, reliability and wide vehicle availability.

We align our activities with our goal expressed in the motto: "We embody outstanding quality and ensure reliable mobility for our customers worldwide." The NEW AUTO Group strategy sets new parameters for transforming the Group into a software-oriented mobility provider. Based on this, our quality strategy focuses primarily on achieving maximum levels of customer satisfaction throughout the entire customer experience – from ordering through to the digital ecosystem and up to aftersales and customer service. Group Quality and the brands' quality organizations play an active role at all stages of product emergence and testing, making an important contribution to successful product launches, high customer satisfaction and low warranty and ex gratia repair costs.[4]

100.    Defendants further tout their quality control efforts:

---

[4] https://annualreport2022.volkswagenag.com/_assets/downloads/entire-vw-ar22.pdf (last visited February 28, 2025).

We strive to identify and rectify quality problems at an early stage during the development of our products to avoid, among other things, delays to the start of production. As we are using an increasing number of modular components as part of our platform strategy, it is particularly important when malfunctions do occur to identify the cause quickly and eliminate the faults. Nonconformity of internally or externally sourced parts, components or functions may necessitate time-consuming and cost-intensive measures, leading to recalls and therefore damage to the Volkswagen Group's image.

To meet our customers' expectations and minimize warranty and ex gratia repair costs, we are continuously optimizing the processes at our brands with which we can prevent these faults. If quality management is ineffective, there is a risk of losing ISO 9001 and KBA certification. This would lead directly to a loss of type approval from one or more authorities. We counter this risk by continuously training the Group's system auditors, while our quality management system and process quality undergo internal audits. We also check the conformity of series products (CoP – conformity of production) in vehicle production plants as part of system audits with a CoP component. Further risks are associated with discrepancies identified in conformity of production measurements and in-service-conformity (ISC) measurements. We have established an effective system for monitoring the conformity of CoP and ISC measurements for manufactured vehicles. To ensure that the results of the emissions CoP and ISC measurements are analyzed systematically, we have implemented an IT system throughout the Group. This is used for status reporting and documenting the results of the series of measurements. Vehicle registration and operation criteria are defined and monitored by national and, in some cases, international authorities. Furthermore, several countries have special – and in some cases new – rules aimed at protecting customers in their dealings with vehicle manufacturers. We have established quality processes so that the Volkswagen Group brands and their products fulfill all respective applicable requirements and local authorities receive timely notification of all issues requiring reporting. By doing so, we reduce the risk of customer complaints or other negative consequences.[5]

101.    Additionally, Defendants have adopted ISO 26262, a global standard for functional safety in the automotive industry. The standard outlines the requirements for designing, developing, and testing automotive systems. Compliance with the standard is documented and subject to regular internal and external audits. By adhering to the ISO 26262 standard, Defendants ensure that their vehicles, including the Class Vehicles, are designed and built with a systematic

---

[5] https://www.volkswagen-group.com/en/publications/more/annual-financial-statements-of-volkswagen-aktiengesellschaft-as-at-31-12-2023-2673 (last visited February 28, 2025).

approach to safety.[6]

102.    Through their quality control measures, Defendants knew or should have known of the Cylinder Head Defect.

**D.  Defendants Concealed the Cylinder Head Defect**

103.    Defendants describe the engines in the Class Vehicles as compact, highlighting that "the exhaust headers have been integrated directly into the cylinder head, not only optimizing the system coolant operation (aiding rapid warm-up, which helps improve efficiency), but also allowing greater thermal management of the exhaust stream."[7]

104.    Defendants tout the features of the Atlas, including engine performance.[8] Specifically, Defendants refer to the Atlas's engine power as capable of taking a family of seven "pretty much anywhere without breaking a sweat."[9]

105.    Defendants offer Class Members "a choice of two ***powerful and efficient*** engines— a 2.0-liter turbocharged four-cylinder or an available 3.6-liter VR6 engine."[10]

---

[6] https://www.volkswagen-group.com/en/publications/more/further-esg-topics-1865 (last visited February 28, 2025).

[7] https://media.vw.com/en-us/press-kits/2019-atlas-press-kit (last visited February 28, 2025).

[8] https://www.auto-brochures.com/makes/Volkswagen/Atlas/VW_US%20Atlas_2018-og.pdf (last visited February 28, 2025); https://www.auto-brochures.com/makes/Volkswagen/Atlas/VW_US%20Atlas_2019-og.pdf (last visited February 28, 2025); https://www.auto-brochures.com/makes/Volkswagen/Atlas/VW_US%20Atlas_2020-og.pdf (last visited February 28, 2025); https://www.auto-brochures.com/makes/Volkswagen/Atlas/VW_US%20Atlas_2021-og.pdf (last visited February 28, 2025); https://www.auto-brochures.com/makes/Volkswagen/Atlas%20Cross%20Sport/VW_US%20AtlasCS_2020-og.pdf (last visited February 28, 2025); https://www.auto-brochures.com/makes/Volkswagen/Atlas%20Cross%20Sport/VW_US%20AtlasCS_2021-og.pdf (last visited February 28, 2025).

[9] https://cdn.dealereprocess.org/cdn/brochures/volkswagen/2018-atlas.pdf (last visited February 28, 2025).

[10] https://media.vw.com/en-us/releases/857 (last visited February 28, 2025); https://media.vw.com/assets/documents/original/9417-2019AtlasRelease.pdf (last visited February 28, 2025) (emphasis added).

106.     Defendants also boast that the Class Vehicles have lower maintenance costs than Defendants' competitors.[11]

107.     Defendants could have provided Class Vehicle owners and lessees with adequate and satisfactory notice of the Defect, including through their sales and marketing representations, their network of agents and dealers, in owners' manuals, on their website, in Class Vehicle brochures, and on the window stickers. Instead of notifying the public and/or the Class of the Defect, Defendants actively concealed this material information and continued to sell and lease Class Vehicles.

108.     Despite Defendants' representations of powerful engine performance and safety, the Cylinder Head Defect prevents the engine in the Class Vehicles from working as directed and poses a potential safety hazard for Class Members who may experience sudden and catastrophic engine failure while operating their Class Vehicles.

109.     Defendants failed to disclose to Plaintiffs and the Class the existence of the Cylinder Head Defect contained in the Class Vehicles. Defendants have also failed to develop an effective fix for the sudden failures the Defect causes.

110.     As a consequence of Defendants' actions and inaction, Class Vehicle owners have been deprived of the benefit of their bargain, lost full use of their Class Vehicles, and incurred lost time and out-of-pocket costs, including payments for (1) the costs for diagnosis and (2) the costs to make the necessary repairs. The Class Vehicles have also suffered a diminution in value due to the Defect.

111.     Had Plaintiffs and Class Members known about the Cylinder Head Defect, they

---

[11] *See* https://media.vw.com/en-us/press-kits/2019-atlas-press-kit (last visited February 28, 2025). *See also* https://www.vw.com/en/models/atlas-cross-sport.html (last visited February 28, 2025).

would not have purchased or leased their Class Vehicles or would have paid significantly less for them.

### E.  **Complaints by Other Class Members.**

112.    Plaintiffs' experiences are by no means an isolated or outlying occurrences. Indeed, the internet is replete with examples of blogs and other websites where consumers have complained of the exact same Cylinder Head Defect in the Class Vehicles.[12]

113.    The Office of Defects Investigation within NHTSA conducts defect investigations and administers safety recalls to support NHTSA's mission to improve safety on the Nation's highways.[13] All vehicle manufacturers, including Defendants, are legally obligated to routinely monitor and analyze NHTSA complaints in order to determine whether vehicles or automotive components should be recalled due to safety concerns, and Defendants thus had knowledge of any and all NHTSA complaints.  *See* TREAD Act, Pub. L. No. 106-414, 114 Stat. 1800 (2000).

114.    The following is just a small sampling of the many complaints submitted to NHTSA by Class Vehicle owners. These publicly available complaints evidence Defendants' knowledge of the Cylinder Head Defect, the negative experiences encountered by Class Members, and the financial burden this places on them:[14]

> **NHTSA ID Number:** 11153636
> **Date of Incident:** November 25, 2018
> **Complaint Date:** November 25, 2018
> **Consumer Location:** BROOKLYN, NY
> **Summary of Complaint:**

---

[12] *See infra* notes 13-28.

[13] *See* NHTSA URGES EVERYONE TO CHECK FOR RECALLS DURING VEHICLE SAFETY RECALLS WEEK, https://www.nhtsa.gov/press-releases/check-recalls-during-vehicle-safety-recalls-week. (last visited February 28, 2025) (Vehicle manufacturers are required by law to report any potential safety defects to the United States government).

[14] The following complaints are reproduced as they appear online. Any typographical errors are attributable to the original author.

THE COOLANT WARNING LIGHT WENT ON 3 DAYS AGO. WHEN I FIRST START THE ENGINE IN THE MORNING OR AFTER HOURS OF PARKING, THE COOLANT WARNING LIGHT WENT ON. AFTER THE ENGINE TEMPERATURE GOES UP, I HAVE TO TURN THE ENGINE OFF AND ON AGAIN TO HAVE THE COOLANT WARNING LIGHT DISAPPEARED. THIS IS AN ONE YEAR OLD VEHICLE WHICH HAS 10500 MILES. I HAVE DRIVEN 6 BRANDS OF VEHICLES IN MY LIFE BUT THIS IS THE VERY FIRST TIME TO HAVE A COOLANT PROBLEM. I CHECKED THAT NO COOLANT LEAKING AND SHORTAGES.

**NHTSA ID Number:** 11196521
**Date of Incident:** October 19, 2018
**Complaint Date:** April 15, 2019
**Consumer Location:** SAN CARLOS, CA
**Summary of Complaint:**
TL* THE CONTACT OWNS A 2018 VOLKSWAGEN ATLAS. WHILE DRIVING 15 MPH, THE VEHICLE STALLED WITHOUT WARNING. THE CONTACT STATED THAT THERE WAS AN ABNORMAL SWEET AND MUSTY ODOR EMERGING FROM THE VEHICLE. THE CONTACT AND OCCUPANTS SUSTAINED HEADACHES AND NAUSEA DUE TO THE ODOR. MEDICAL ATTENTION WAS NOT RECEIVED. THE VEHICLE WAS TOWED TO WINN VOLKSWAGEN (39695 BALENTINE DR, NEWARK, CA 94560, (510) 344-2013) WHERE IT WAS DIAGNOSED THAT THERE WAS A COOLANT LEAK AND AN ENGINE REPLACEMENT WAS NEEDED. THE VEHICLE WAS NOT REPAIRED. THE MANUFACTURER WAS CONTACTED AND PROVIDED CASE NUMBER: 190150480. NO FURTHER ASSISTANCE WAS PROVIDED. THE CONTACT REQUESTED A BUYBACK OF THE VEHCILE. THE FAILURE MILEAGE WAS 7,300.

**NHTSA ID Number:** 11279913
**Date of Incident:** November 11, 2019
**Complaint Date:** November 13, 2019
**Consumer Location:** Westland, MI
**Summary of Complaint:**
COOLANT LEVEL IS LOW. THEY SAID IS A LEAK ON IT WHICH IS GOING INSIDE THE ENGINE. THIS A MAJOR MAJOR ISSUE FOR THIS BRAND AND EXPENSIVE CAR. MY CAR HAD ONLY 8400 MILES ON IT. ONE YEAR OLD. THIS IS ON UNACCEPTABLE, FOR SO MUCH MONEY I PAYED. AND SO MUCH FOR 'GERMAN ENGINEERING' PLEASE INVESTIGATE THIS NOT THE FIRST VEHICLE COMPLAING LOOK AT THE FB PAGE VW ATLAS COMPLAINS.

**NHTSA ID Number:** 11318529
**Date of Incident:** March 14, 2020
**Complaint Date:** March 17, 2020
**Consumer Location:** Harrah, OK
**Summary of Complaint:**

HAVE HAD MY 2019 VOLKSWAGEN SEL R LINE 4 MOTION FOR LESS THAN A MONTH WITH ONLY 2,000 MILES ON IT. WAS DRIVING DOWN THE ROAD NOT 20 MINUTES LATER ON ROUTE 66 THE COOLANT LIGHT CAME ON TELLING US IT WAS LOW AND NEEDED TO BE CHECKED. WE PULLED OVER AND THE OVERFLOW TANK WAS EMPTY. WE IMMEDIATELY CALL VOLKSWAGEN OKC AND THE SALES MANAGER WAS IN DISBELIEF ALSO. SHE TOLD US TO GET IT TO THEM AS SOON AS POSSIBLE AND THEY WOULD TAKE CARE OF IT. WE ADDED WATER TO IT AND ONLY WATER SO WE DIDN'T JEOPARDIZE OUR WARRANTY. DIDN'T MAKE IT 5 MINUTES WHEN IT SAID IT WAS LOW AGAIN AND OVER HEATING. WE ADDED MORE WATER AS NEEDED AND GOT IT BACK TO DEALERSHIP. THE SERVICE DEPARTMENT WAS CLOSING SO THEY GAVE US A LOANER AND TOLD US WE WOULD HEAR FROM THEM FIRST THING MONDAY. WE DIDN'T HEAR FROM THEM ON MONDAY SO I CALLED THEM FIRST THING TUESDAY MORNING. AT THIS TIME THEY INFORMED ME A ROCK OR DEBRIS FROM ROAD FLEW UP AND PUNCTURED A SMALL HOLE IN RADIATOR AND WE WOULD BE RESPONSIBLE FOR THE $1,500 IN DAMAGE BECAUSE ROAD DEBRIS ISN'T COVERED BY WARRANTY. I WAS BESIDE MYSELF! WE JUST BOUGHT A $40,000 CAR AND NOW NOT EVEN A MONTH LATER THEY ARE TELLING ME THIS WASN'T THEIR PROBLEM. VOLKSWAGEN OKLAHOMA CITY SEEMED SO NICE AND EAGER TO PLEASE WHEN WE WERE PURCHASING OUR VEHICLE AND THEN THIS HAPPENED. I TOLD THEM MY WORRY WAS HOW THIS PROBLEM WOULD NOT HAPPEN AGAIN, EVERY TIME I PULL OUT OF DRIVE WAY I HAVE TO WORRY ABOUT A ROCK CAUSING $1,500 WORTH OF DAMAGE????? THIS DOESN'T SEEM RIGHT. I FEEL LIKE IT'S A FACTORY DEFECT AND NEEDS TO BE FIXED IMMEDIATELY. I DID RESEARCH ONLINE AND FOUND OTHER TESTIMONIALS ABOUT THEIR ATLAS HAVING COOLANT PROBLEMS.

**NHTSA ID Number:** 11337142
**Date of Incident:** July 1, 2020
**Complaint Date:** July 2, 2020
**Consumer Location:** SAN JOSE, CA
**Summary of Complaint:**
UNEXPLAINABLE LOSS OF COOLANT. MY CAR WAS 4 TIMES AT
DEALERSHIP AND THEY NEVER FIND ANY LEAKS BUT I'M
LOOSING COOLANT AND SOMETIMES IT CAN SMELL IT EVAPORATE WHEN
I PARK MY CAR.

**NHTSA ID Number:** 11388276
**Date of Incident:** January 15, 2021
**Complaint Date:** January 15, 2021
**Consumer Location:** Milford, MI
**Summary of Complaint:**

COOLANT LOOSES 8OZ OF FLUID EVERY 2 MONTHS, DEALER SAYS IT "JUST EVAPORATES" IT ONLY HAS 12017 MILES ON IT. JUST SEARCH ALL THE FORUMS TO SEE ALL THE COMPLAINTS OF THE SAME ISSUE.

**NHTSA ID Number:** 11432953
**Date of Incident:** January 11, 2021
**Complaint Date:** January 27, 2021
**Consumer Location:** Plains, TX
**Summary of Complaint:**
AT 8,860 MILES COOLANT LEVEL WARNING APPEARED WHILE IN MOTION ON A CITY STREET. I BELIEVE WE ARE EXPERIENCING A COOLANT LEAK ISSUE. RECOMMENDED COOLANT WAS ADDED TO PROPER LEVEL AND AFTER 1,000 MILES THE LEVEL IS NOTICEABLY LOW AGAIN. THE VEHICLE SHOULD BE PRESSURE TESTED TO FIND THE LEAK AND REPAIR HEAD GASKET, WATER PUMP, OR LEAKY HOSE.

**NHTSA ID Number:** 11394843
**Date of Incident:** January 13, 2020
**Complaint Date:** February 5, 2021
**Consumer Location:** TIFFIN, IA
**Summary of Complaint:**
I HAVE TAKEN MY 18 ATLAS SEL PREMIUM IN AT LEAST 4 TIMES TO HAVE THE COOLANT CHECKI HAVE HAD THE LOW COOLANT WARNING COME ON 3 TIMES STATING THERE IS LOW COOLANT. THERE IS A STRONG BURNING COOLANT SMELL RADIATING FROM MY VEHICLE ON MANY OCCASIONS. WHEN TAKEN TO THE DEALER THEY HAVE DONE OVERNIGHT PRESSURE TESTS AND CANNOT FIND THE LEAK. MY CAR IS NOW OUT OF WARRANTY AND I FEAR NOW THEY WILL FIND THE ISSUE AND MAKE ME RESPONSIBLE.

**NHTSA ID Number:** 11399186
**Date of Incident:** March 4, 2021
**Complaint Date:** March 4, 2021
**Consumer Location:** Schleswig, IA
**Summary of Complaint:**
2018 ATLAS WITH UNDER 17K AND AIR BAG ERROR COMES ON. ALSO LEAKING COOLANT.

**NHTSA ID Number:** 11413984
**Date of Incident:** April 1, 2021
**Complaint Date:** April 26, 2021
**Consumer Location:** CHANDLER, AZ
**Summary of Complaint:**
PURCHASED MY CAR IN MAY OF 2019 IN JAN/FEB WHILE DRIVING COOLANT LIGHT CAME ON ' VERIFIED COOLANT WAS LOW ONCE VEHICLE WAS ABLE TO COOL DOWN TOOK IT TO THE DEALER THEY SAID IT

EVAPORATED AND THERE IS NOTHING WRONG FAST FORWARD TO APRIL OF 2021 COOLANT LIGHT CAME ON AGAIN WHILE DRIVING, VEHICLE HAD ROUGHLY 11,500 MILES. COOLANT WAS AGAIN LOW BUT THE LIGHT CAME OFF BY ITSELF. TOOK IT ONE DEALER SAID IT PROBABLY EVAPORATED AND THEY REFILLED IT, TAKING IT TO ANOTHER BUT THEY ALREADY INDICATED IT IS PROBABLY JUST EVAPORATING. IT IS A CLOSED SYSTEM IT IS EVAPORATING BUT WHERE ... TRIED TO EXPLAIN THIS TO THEM THEY TOLD ME NOT TO BELIEVE MANY OTHER ONLINE FORUMS AND THAT MY CAR IS PROBABLY FINE. EXCEPT IT IS NOT FINE IT IS BRAND NEW CAR LEAKING COOLANT ...

**NHTSA ID Number:** 11432953
**Date of Incident:** June 1, 2019
**Complaint Date:** September 14, 2021
**Consumer Location:** Midlothian, VA
**Summary of Complaint:**
The contact owns a 2018 Volkswagen Atlas. The contact stated that while the vehicle was parked in the garage, an abnormal odor was detected. The coolant warning light was illuminated. The vehicle was taken to the dealer on several occasions and diagnosed with a faulty water pump and head gasket. The dealer was unable to identify where the coolant was traveling to. The dealer refilled the coolant and replaced the timing belt, head gasket, and water pump three separate times however, the failure recurred. The manufacturer was made aware of the failure. The failure mileage was approximately 20,000.

**NHTSA ID Number:** 11437353
**Date of Incident:** October 15, 2021
**Complaint Date:** October 19, 2021
**Consumer Location:** Unknown
**Summary of Complaint:**
Continually leaks coolant.

**NHTSA ID Number:** 11448985
**Date of Incident:** October 15, 2021
**Complaint Date:** January 26, 2022
**Consumer Location:** Seaford, DE
**Summary of Complaint:**
After 3 months of owning this brand new car, the parking system started to act up. My parking sensors would beep for no reason, windows would roll down and my parking brake would come on when I was driving. I took the car to the dealership and they did an electrical update. Two months later the same issue happened again, as well as my engine light came on because my coolant was low. Again I took it to the dealership where I was told a door harness sensor needed to be replaced and my head gasket needed to be replaced as well. My car has been in the shop for almost two months as the part is on back order. Now there is also a recall for the air conditioner. This is the worst experience with a new car I have ever had. I have initiated the process of trying to get Volkswagen to buy it back. When I spoke to the service manager he told me he has 9 other Atlas's in the shop for the same

reason. Customer care has been no help. I will never buy another Volkswagen again.

**NHTSA ID Number:** 11545293
**Date of Incident:** February 11, 2022
**Complaint Date:** March 19, 2022
**Consumer Location:** Groton, CT
**Summary of Complaint:**
The vehicle has had issues with the torque converter, head, head gasket, electrical system, gas cap door, seat belt. VW has not been able to fix the issues.

**NHTSA ID Number:** 11545293
**Date of Incident:** February 11, 2022
**Complaint Date:** March 19, 2022
**Consumer Location:** Groton, CT
**Summary of Complaint:**
The vehicle has had issues with the torque converter, head, head gasket, electrical system, gas cap door, seat belt. VW has not been able to fix the issues.

**NHTSA ID Number:** 11491865
**Date of Incident:** September 16, 2022
**Complaint Date:** November 2, 2022
**Consumer Location:** Glencoe, OK
**Summary of Complaint:**
I own a 2019 vw atlas and I had called the dealership about low coolant level light that had came on and you know what I was told it's common in the atlas's and that they just use coolant and I'm thinking to my self that cars don't just use coolant and I'm finding out more and more a lot of people are having this issue the funny thing is that the had told me to just come on down and they will top it off with coolant.

**NHTSA ID Number:** 11515717
**Date of Incident:** March 1, 2023
**Complaint Date:** April 6, 2023
**Consumer Location:** Unknown
**Summary of Complaint:**
Low coolant level warning comes on every few days. I've taken the car to the dealership and they say it's a common issue. There doesn't seem to be a fix as far as I know.

**NHTSA ID Number:** 11552048
**Date of Incident:** September 28, 2023
**Complaint Date:** October 26, 2023
**Consumer Location:** Unknown
**Summary of Complaint:**
My '19' Atlas had given me several issues after 2 years. The engine light has illuminated several times. Im not sure if is just being reset or if the problem is actually being fixed. At

any rate, I have continuously complained about smelling coolant since Feb 21. Only to bring vehicle in, have the coolant topped off, and hear it's nothing's wrong. It has been checked and inspected and yet there has been no headway of the originating of the issue. The dealer has changed the canister & head gasket a few times (even speculated water pump issues). It was said the problem had been fixed. That statement couldn't be more INACCURATE a few weeks ago I was told I needed a new head/spark plugs and the block was warp and I would not be able to drive it until it was repaired (a $5k job). My vehicle is 4 years old it is well kept and is always in for scheduled/routine maintenance. I was told this is a known issue. Had I been told this before buying, I would of reconsidered my purchase. Why isn't this a manufacturers recall? Or the buyer isn't informed. The manufacturer should be mandated to use reliable materials for this vehicle. For a vehicle to fail at 70k is insane. I am utterly disgusted. In addition, the collision display randomly comes on while driving and vehicle often halts unexpectedly. Unsafe if driving on the road with other vehicles. I have brought it to the dealers attention several times unsure if it has been annotated but I am always told bring it back if it does it again. And no solution has been given. This has been a problem well over a year and a half. AGAIN this should be a recall issue. I love this vehicle and want to keep it but these experiences will definitely detour me from future purchases of the VW brand.

**NHTSA ID Number:** 11557752
**Date of Incident:** November 27, 2023
**Complaint Date:** November 30, 2023
**Consumer Location:** Lakewood, CA
**Summary of Complaint:**
2018 Atlas SEL Premium 3.6L V6. Currently at VW dealership for warranty work. Vehicle has had coolant leaks in the past where dealer replaced water pump. Atlas in for the third time for misfiring in cylinder 6 and other misfiring engine codes. They found issues with the head cylinder gasket and will be replacing the head gasket. There are blogs about this issue throughout the internet.

**NHTSA ID Number:** 11559300
**Date of Incident:** November 26, 2023
**Complaint Date:** December 9, 2023
**Consumer Location:** Woodworth, LA
**Summary of Complaint:**
Head gasket failure. Dealership is going to replace the entire head (s) to fix the problem. An unknown amount of coolant fluid has leaked into the engine block. Untreated, the problem could have lead to engine failure while traveling at interstate speeds. VW of Lake Charles currently has my vehicle while the repairs take place. I noticed the coolant level was around minimum level on the overflow tank twice in the last 1-1.5 years. About 10 days ago, the coolant level dropped low enough for the sensor to go off, warning lights came on and the digital display stated low coolant. I also found dry coolant under the engine on the bottom of the car.

**NHTSA ID Number:** 11618245
**Date of Incident:** October 5, 2024
**Complaint Date:** October 5, 2024

**Consumer Location:** Unknown
**Summary of Complaint:**
Bought this vehicle new from dealer. Have had all maintenance done at the suggested intervals by VW. Have had ongoing issues with "check coolant" alerts. Coolant has been low on multiple occasions but dealer assures there is no leak. I'm am now out of warranty and car has lost coolant again, well below the minimum level required. Please help with ongoing issues that now dealer will not cover. Being inspected now for water pump failure, radiator core, etc. I feel as though this coolant level problem is being hidden and pushed along until customers are out of warranty. Please help.

**NHTSA ID Number:** 11618630
**Date of Incident:** October 8, 2024
**Complaint Date:** October 8, 2024
**Consumer Location:** Unknown
**Summary of Complaint:**
Vehicle was left parked over the weekend and on Tuesday I went to start the car and got errors of a low coolant. Vehicle suffered a massive coolant leak just sitting on the weekend. Two year old vehicle with 27K miles.

**NHTSA ID Number:** 11628902
**Date of Incident:** December 1, 2022
**Complaint Date:** December 4, 2024
**Consumer Location:** Belleville, IL
**Summary of Complaint:**
The contact owns a 2021 Volkswagen Atlas Cross Sport. The contact stated that the vehicle was experiencing excessive coolant consumption. The vehicle was taken to the vehicle, where coolant was added to the vehicle; however, the low coolant warning light was illuminated. The vehicle was taken to the dealer, where the cooling system was replaced. The contact stated while driving at various speeds, the contact noticed an abnormal coolant odor inside the cabin of the vehicle. The check engine warning light was illuminated. The vehicle was taken back to the dealer, where the front passenger's side air bag was replaced. Additionally, the dealer diagnosed that coolant was leaking onto the top of the engine. The dealer replaced the cylinder head, the filters, the cooling system, the motor mount. Additionally, the dealer installed a new head gasket and new bolts, and the dealer rebuilt a new cylinder head. The contact stated while driving 60-65 MPH, the check engine warning light was illuminated and the vehicle nearly stalled. The contact exited the highway and pulled to the side of the road. The contact called the dealer and scheduled an appointment for the following day. The vehicle was taken to the dealer, where the engine was taken apart for diagnostic testing. The dealer replaced the engine with a used engine; however, the failure persisted. The contact stated that the dealer had taken the dashboard apart to allow a Volkswagen engineer located in Germany to monitor the failure remotely. The vehicle was not repaired. The manufacturer was notified of the failure. The failure mileage was 30,000.

**NHTSA ID Number:** 11637408
**Date of Incident:** August 28, 2023
**Complaint Date:** January 31, 2025

**Consumer Location:** Summerville, SC
**Summary of Complaint:**
The first issue at 26k miles when the coolant light turned on. It was a broken head gasket which required the replacement of the full motor on the vehicle. After the motor was replaced, the vehicle had to be taken back to the dealership that completed the work on 3 different occasions for installation concerns including a loose bolt and low coolant levels. The second issue at 33k miles was the failure of the charcoal canister which ruined the fuel tank lining, resulting a replacement of the fuel tank. This issue caused the car to stall anytime it was idle (if I was in traffic and not able to accellerate or in a parking lot going slowly, it would stall requiring it to be put into park and restarted. This issue was a huge safety concern since my car would shut down in traffic. No indicator lights came on during this issue. Next, at 37k miles, I smelled terrible gas fumes each time the car idled. At one point, when blowing my nose, I had black soot residue, so I can't imagine what I was breathing or the risk of the vehicle catching fire with such strong fumes. I had to take the car in twice before they took me seriously. The car had broken O rings from the engine replacement. No indicator lights came on for this issue either. Last week, we received the car back after 33 days in the shop for ANOTHER broken head gasket. Within a day of getting the car back, it misfired and the check engine light was on again. The car does not accellerate correctly which poses a safety risk when trying to pull out into moving traffic or cross oncoming traffic. Volkswagen corporate office is well aware of all the issues but declined the buy-back process because we don't fall under our state's lemon laws.

115.    Moreover, consumers have complained of the Defect on popular consumer forums. The following is just a small sampling of the many complaints by Class Vehicle owners. These publicly available complaints evidence Defendants' knowledge of the Cylinder Head Defect, the negative experiences encountered by Class Members, and the financial burden this places on them:[15]

a.    On January 8, 2020, a consumer wrote: "Here we go again, another long day in the car mines and today I dug up an Atlas head gasket. These are not new for me, I've done a lot of them, over 20 of them so far in my year and a half as a Volkswagen technician. However, this is the first 2019 model, which is not great news for me because until this vehicle they've all been 2018 with 10-20,000 miles. I've seen one with 32,000 miles, but most are in the teens… This one today is a 2019 with 10,000 miles… I diagnosed it a couple days ago, and the parts were all in today, so I decided I'd slam it out."[16]

---

[15] The following complaints are reproduced as they appear online. Any typographical errors are attributable to the original author.

[16] https://www.springfieldvw.com/topics/2019-atlas-head-gasket-3-6l/ (last visited February 28, 2025).

b. On April 26, 2021, a consumer wrote: "Hi everyone I saw that many of you had issues with the coolant leak. it seems that our 2019 Atlas V6 is having the same issue…coolant light came on at 5k was told coolant evaporated…Coolant light came on at 11k and I went back in and told them about similar issues I saw people had shared on these forums they brushed me off and told me not to believe everything I see on the internet and that is probably just evaporated again ....I am concerned that this will cause issues down the road I am taking it in again tomorrow and I called VW corporate to open a case but they brushed me off too — told me to trust the dealer expertise... when clearly there is an issue ... coolant doesn't just evaporate ..."[17]

c. On January 6, 2022, a consumer wrote: "We initially noticed a low coolant warning back in 2020 and took her Atlas into Demontrond VW Conroe. They diagnosed it as a bad head gasket, replaced it, and confirmed it passed their pressure test. Went about 4 months or so, and receive another low coolant warning. Took it back to Demontrond, diagnosed it as a leaking water pump, replaced the pump, passed their tests, all was "good". Fast forward to right before Thanksgiving 2021. Low coolant warning comes on again. Now from the time we took it in way back for the head gasket replacement, I had googled and seen that many Atlas' had warped cylinder heads due to manufacturing assembly QC. This time, I made the dealer confirm that the head wasn't warped, and of course when they did their checks, they confirmed that the head was indeed warped. So now we start our timeline..... Nov 22 - Take vehicle in for low coolant warning (3rd time overall). Nov 23 - Dealer confirms cylinder head is warped. Confirms order with VW is placed for replacement head. ETA unknown at this point."[18]

d. On January 6, 2022, a consumer wrote: "Wow OP, making me feel great about trading mine in right when I got the head gasket fixed. We too had the coolant issue and needed q head gasket replaced. I stopped trusting it. Maybe see about VW Clear Lake, they fixed the head gasket issue in 2 weeks and gave us a loaner atlas that really helped us out and they were really easy to deal with from beginning to end. I traded the atlas in for more than I paid for it about 3 days after I got it back from the dealer. Good luck."[19]

e. On February 22, 2022, a consumer wrote: "Coolant was puddling under car and coolant reservoir kept getting emptied. Coolant was splashing around on passenger side area near front of engine cavity. Dealership checked it out and replaced the part quickly and refilled the coolant. We first experienced the low coolant light while we were deep in the mountains and couldn't find replacement G13 coolant so we settled for distilled water until we could get back to the city."[20]

---

[17] https://www.vwatlasforum.com/threads/complaint-help.6445/ (last visited February 28, 2025).
[18] https://texags.com/forums/46/topics/3264322 (last visited February 28, 2025).
[19] *See id.*
[20] *See id.*

f.  In 2023, a consumer wrote: "I have a question for all atlas owners, have any of you had head gasket problems and coolant issues? Mine has 2017, my brothers is newer 2019 and he also has the same problem."[21]

g.  In response to the above, a consumer wrote: "On both my 2018 and now my 2021.5. Each time they run the tests and tell me nothing is wrong. Well then where does all the coolant go?"[22]

## F.  Complaints by Owners of Other Vehicles Manufactured by Defendants

116.  Defendants also knew of the Defect through complaints posted on popular and widely viewed consumer websites by owners and lessees of other vehicles that utilize the same defective head gaskets. The following is just a small sampling of the many complaints by Class Vehicle owners, and are complaints related to MY2006-2018 Volkswagen vehicles. These publicly available complaints evidence Defendants' knowledge of the Cylinder Head Defect, the negative experiences encountered by Class Members, and the financial burden this places on them:[23]

a.  In November, 2006, a consumer wrote: "So my guage spikes past 190 going up hills and at long idle. Mechanic replaced the waterpump and thermostat -- then fan sensors gratis, when that didn't help. A quickie oil change place fouled the G12 coolant several years ago with green stuff... I replaced the coolant with new G12 about two months ago, and the problem soon started. I'm wondering if running bad coolant could have corroded the radiator and caused this problem... Strangely, when I run the heater to cool the engine down, it sometimes blows cool air, even though the engine is hot... Might circulation through the radiator be an issue? I'm also wondering if -- even though I don't have oil and coolant mixing, or power loss -- if an exhaust leak through the head gasket is causing the problem. The mechanic I usually rely on -- not the dumba** who did the water pump -- seems to like that one. Anybody have any ideas?"[24]

b.  On May 12, 2013, a consumer wrote: "Ok, so the car in question isn't mine, I'm an aircooled guy and I have a 12 GLI for a daily. My buddy has a 2006 3.6 Passat. The

---

[21]

https://www.reddit.com/r/VWatlas/comments/10y5qec/i_have_a_question_for_all_atlas_owners_have_any/ (last visited February 28, 2025).

[22] *See id.*

[23] The following complaints are reproduced as they appear online. Any typographical errors are attributable to the original author.

[24] https://forums.edmunds.com/discussion/6497/volkswagen/passat/volkswagen-passat-turbo-issues (last visited February 28, 2025).

car has 120k on it and I got a call from him tonight with some text message follow ups about some issues he is having with his car. Basically the symptoms are this: oil in the coolant res, no cross contamination on the oil dipstick (looks clean) and a large whooshing sound with a severe loss in power and last but not least oil leaking out the side of the block between the head and block mating surface. So that says to me blown headgasket with a crack large enough get to the outside of the motor. So much so that it sounds like its losing compression. So my questions are as follows... Are there any recalls, TSB's or known issues with the 3.6 doing this? 120k seems like its too early for such a failure. Both of us are close to 40 and we stopped hotrodding our cars around a while back. He's kept good care of the car and I guess it just seems odd that it would trash itself so soon. I'm not super familiar with these motors so any insight from you folks would help. I guess I'm just hoping to give him some ammo to go to the dealership with when he takes the car in tomorrow."[25]

c.  On February 9, 2014, a consumer wrote: "The contact owns a 2008 Volkswagen Passat. The contact stated that while driving 30 mph, the engine stalled as the oil warning light illuminated. The contact added oil to the vehicle but the engine refused to start. The vehicle was towed to the dealer for inspection where they stated that the timing belt and the head gasket needed to be replaced. The vehicle was not repaired. The manufacturer was notified of the failure. The failure mileage was 125,000."[26]

d.  On June 7, 2018, a consumer wrote: "I HAVE OIL ON MY RADIATOR RESERVOIR IVE BEEN TOLD I HAVE A BLOWN HEAD GASKET WOULD I STILL BE ABLE TO USED YOUR PRODUCT IN MY CASE? I ALSO HAVE A OIL LEAK. THIS IS ON A 2006 VW PASSAT 2.0T."[27]

e.  In 2021, a consumer wrote: "2012 VW Passat overheating issue.In 2018 it overheated (red line) Oil and coolant mixing. Took it to a shop they "fixed" itIn 2020 it started misfiring on cylinder 1. Turns out the head was cracked and I had the head resurfaced. That seemed to delay the overheating issue. But come to find out that the mechanic had drilled some holes in the thermostat to prevent it from overheating. While the theromstat with holes drilled in it is in the car produces no heat (A/C). It is not currently overheating with the thermostat with holes drilled through but when a regular thermostat is added then it overheats shortly after. Also the car produces heat(A/C) when this thermostat is inserted."[28]

---

[25] https://www.vwvortex.com/threads/blown-headgasket-on-3-6-questions-for-you-guys.6038772/ (last visited February 28, 2025).

[26] https://www.carcomplaints.com/Volkswagen/Passat/2008/engine/engine-2.shtml (last visited February 28, 2025).

[27] https://gobdp.com/blog/can-you-drive-with-a-cracked-head-gasket/ (last visited February 28, 2025).

[28] https://www.justanswer.com/car/i1a7m-2012-vw-passat-overheating-issue-2018-overheated-red.html (last visited February 28, 2025).

f. On February 12, 2023, a consumer wrote: "I just picked up a 2012 Passat 3.6 were guy thought head gasket was bad. The coolant is all milkshake like and appears someone put a head gasket fix in the coolant at one point as the tube from reservoir is chunky hard. I have a leak in the upper heater core hose and the coolant coming out is milky aswell. But the oil has no coolant in it at all and the car does not overheat and no misfires runs fine actually. Once the car gets up to temp the reservoir does bubble but I'm wonder if that's because of all the crap inside that line. Is it possible it's a oil cooler? I'm thinking about getting a oil cooler, oil filter housing, hose from reservoir and a upper heater core line. And then flushing the system out really good. Opinions anyone?"[29]

## G. **Defendants' Warranty Practices**

117.  Defendants tout the VW Atlas's warranty as "America's best SUV bumper-to-bumper transferable warranty" and "The People First Warranty."[30]

118.  Despite longstanding knowledge of the Defect as set forth above, Defendants refuse to provide warranty coverage for the repairs when the Defect manifests.

119.  For the model year 2018 to model year 2019 Class Vehicles, Defendants provided a 6-year/72,000-mile New Vehicle Limited Warranty, which "includes powertrain coverage for their engines, transmissions.

120.  For the model year 2020 to model year 2021 Class Vehicles, Defendants provided a 4-year/50,000-mile New Vehicle Limited Warranty.

121.  Nevertheless, when Class Members seek warranty coverage for the Defect, even within the warranty period, Defendants often fail to respond or deny warranty coverage.

122.  Defendants evade their warranty obligations by claiming that the Defect is not a defect, and thus deny warranty coverage to repair the Defect.

---

[29] https://forums.ross-tech.com/index.php?threads/36068/ (last visited February 28, 2025).
[30] https://media.vw.com/en-us/releases/866 (last visited February 28, 2025); https://www.auto-brochures.com/makes/Volkswagen/Atlas/VW_US%20Atlas_2019.pdf (last visited February 28, 2025).

123.    Moreover, some Class Vehicles manifest the Defect just outside Defendants' warranty period. But the mileage and temporal limitations Defendants impose on their warranties are unconscionable and unenforceable.

124.    Defendants provide these Limited Warranties to buyers after a purchase is complete. Buyers like Plaintiffs and Class Members lack pre-sale knowledge of the Defect or the ability to bargain as to the terms of the Defendants' warranties. Accordingly, the limitations Defendants impose on the Limited Warranties—and their efforts to disclaim any implied warranties—are procedurally unconscionable because there was unequal bargaining power between Defendants and Plaintiffs and the other Class Members, as, at the time of purchase, Plaintiffs and the other Class Members had no other options for purchasing alternative warranty coverage for Class Vehicles.

125.    All of Defendants' purported limitations on the warranties, including the time and mileage limits, are also substantively unconscionable. Defendants knew that Class Vehicles suffered from the Defect and that the Defect would continue to pose safety risks after the warranties purportedly expired, yet failed to disclose the Defect to Plaintiffs and the other Class Members while continuing to market Class Vehicles as safe and reliable. Defendants' enforcement of those limitations is thus harsh and shocks the conscience.

126.    Defendants' efforts to evade their warranty obligations with respect to the known Defect, coupled with their refusal to cover the Defect if it manifests outside the warranty's stated term, deprives Plaintiffs and Class Members of the benefit of their bargain, forcing them to pay out of pocket to repair a defect present in Class Vehicles at the time of purchase.

## **CLASS ACTION ALLEGATIONS**

127.    Plaintiffs bring this action individually and on behalf of the following class

pursuant to Fed. R. Civ. P. 23(a), 23(b)(2), and/or 23(b)(3). Specifically, the proposed nationwide

class is defined as follows:

**Nationwide Class:**
All persons or entities in United States who are current or former owners and/or lessees
of a Class Vehicle (the "Nationwide Class").

128.     In the alternative to the Nationwide Class, and pursuant to Fed. R. Civ. P. 23(c)(5),

Plaintiffs seek to represent the following state subclasses ("State Classes"):

**Maryland Class:**
All persons or entities who are: (1) current or former owners and/or lessees of a Class
Vehicle; and (2) reside in Maryland.

**Massachusetts Class:**
All persons or entities who are: (1) current or former owners and/or lessees of a Class
Vehicle; and (2) reside in Massachusetts.

**Virginia Class:**
All persons or entities who are: (1) current or former owners and/or lessees of a Class
Vehicle; and (2) reside in Virginia.

**Wisconsin Class:**
All persons or entities who are: (1) current or former owners and/or lessees of a Class
Vehicle; and (2) reside in Wisconsin.

129.     Together, the Nationwide Class and the State Classes shall be collectively referred

to herein as the "Class."

130.     Excluded from the Class and State Class are Defendants, their affiliates, employees,

officers and directors, persons or entities that purchased the Class Vehicles for resale, and the

Judge(s) assigned to this case. Plaintiffs reserve the right to modify, change, or expand the Class

definitions after conducting discovery.

131.     Numerosity: Upon information and belief, the Class is so numerous that joinder of

all members is impracticable. While the exact number and identities of individual members of the

Class is unknown at this time, such information being in the sole possession of Defendants and

obtainable by Plaintiffs only through the discovery process, Plaintiffs believe that tens of thousands of Class Vehicles have been sold and leased throughout the United States, including thousands within each of the State Classes.

132.    <u>Existence and Predominance of Common Questions of Fact and Law</u>: Common questions of law and fact exist as to all members of the Class. These questions predominate over the questions affecting individual Class Members. These common legal and factual questions include, but are not limited to:

    a.  whether the Class Vehicles are predisposed to the Defect;

    b.  whether Defendants knowingly failed to disclose the existence and cause of the Cylinder Head Defect;

    c.  when Defendants first learned of the Cylinder Head Defect;

    d.  whether Defendants violated Md. Code Comm. Law §§ 13-101 *et seq*. in connection with their advertisement and marketing campaign of the Class Vehicles;

    e.  whether Defendants violated Mass. Gen. Laws Ch. 93A in connection with their advertisement and marketing campaign of the Class Vehicles;

    f.  whether Defendants violated Va. Code Ann. § 59.1-196 *et seq*. in connection with their advertisement and marketing campaign of the Class Vehicles;

    g.  whether Defendants violated Wis. Stat. § 100.18 *et seq*. in connection with their advertisement and marketing campaign of the Class Vehicles;

    h.  whether Defendants violated Wis. Admin Code ATCP § 127.01 *et seq*. and Wis. Stat. § 100.20, in connection with their advertisement and marketing campaign of the Class Vehicles;

     i.   whether Defendants' conduct violates the Magnuson-Moss Warranty Act;

     j.   whether Defendants' conduct constitutes a breach of express warranty;

     k.   whether Defendants' conduct constitutes a breach of implied warranty;

     l.   whether Defendants' conduct constitutes common law fraud;

     m.   whether Defendants' conduct constitutes unjust enrichment; and

     n.   whether Plaintiffs and Class Members are entitled to monetary damages and/or other remedies and, if so, the nature of any such relief.

133. <u>Typicality</u>: All of Plaintiffs' claims are typical of the claims of the Class because Plaintiffs and each member of the Class purchased or leased a Class Vehicle with the Cylinder Head Defect. Furthermore, Plaintiffs and all members of the Class sustained monetary and economic injuries including, but not limited to, ascertainable loss arising out of Defendants' wrongful conduct. Plaintiffs are advancing the same claims and legal theories on behalf of themselves and all absent Class Members.

134. <u>Adequacy</u>: Plaintiffs are adequate representatives because their interests do not conflict with the interests of the Class that they seek to represent, they have retained counsel that are competent and highly experienced in complex class action litigation, and they intend to prosecute this action vigorously. The interests of the Class will be fairly and adequately protected by Plaintiffs and their counsel.

135. <u>Superiority</u>: A class action is superior to all other available means of fair and efficient adjudication of the claims of Plaintiffs and members of the Class. The injury suffered by each individual Class member is relatively small in comparison to the burden and expense of individual prosecution of the complex and extensive litigation necessitated by Defendants' conduct. It would be virtually impossible for members of the Class to individually and effectively

redress the wrongs done to them. Even if the members of the Class could afford such individual litigation, the court system could not. Individualized litigation presents a potential for inconsistent or contradictory judgments. Individualized litigation also increases the delay and expense to all parties, and to the court system, presented by the complex legal and factual issues of the case. By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court. Upon information and belief, members of the Class can be readily identified and notified based on, *inter alia*, Defendants' vehicle identification numbers (VINs), warranty claims, registration records, and the database of complaints.

136.    <u>Injunctive Relief</u>: Pursuant to Fed. R. Civ. P. 23(b)(2), Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief, corresponding declaratory relief, or final equitable relief with respect to the class as a whole.

**<u>first</u> CAUSE OF ACTION**
**VIOLATIONS OF THE MARYLAND CONSUMER PROTECTION ACT**
**(Md. Code Comm. Law §13-301 *et seq.*)**
**(On Behalf of the Maryland Class)**

137.    Plaintiffs and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

138.    Plaintiff Olson brings this claim individually and on behalf of the Maryland Class against Defendants.

139.    Volkswagen is a person as defined by Md. Comm. Code § 13-101(h).

140.    Volkswagen's conduct as alleged herein related to "sales," "offers for sale," or "bailment" as defined by Md. Comm. Code § 13-101(i) and § 13-303.

141.    Plaintiff Olson and Maryland Class Members are "consumers" as defined by Md.

Comm. Code § 13-101(c).

142.    Defendants advertise, offer, or sell "consumer goods or "consumer services" as defined by Md. Comm. Code § 13-101(d).

143.    Defendants advertised, offered, or sold goods or services in Maryland and engaged in trade or commerce directly or indirectly affecting the people of Maryland.

144.    Defendants engaged in unfair and deceptive trade practices, in violation of Md. Comm. Code § 13-301, including:

    a.    False or misleading oral or written representations that have the capacity, tendency, or effect of deceiving or misleading consumers;

    b.    Representing that consumer goods or services have a characteristic that they do not have;

    c.    Representing that consumer goods or services are of a particular standard, quality, or grade that they are not;

    d.    Failing to state a material fact where the failure deceives or tends to deceive;

    e.    Advertising or offering consumer goods or services without intent to sell, lease, or rent them as advertised or offer; and

    f.    Deception, fraud, false pretense, false premise, misrepresentation, or knowing concealment, suppression, or omission of any material fact with the intent that a consumer rely on the same in connection with the promotion or sale of consumer goods or services of the subsequent performance with respect to an agreement, sale, lease, or rental.

145.    Defendants engaged in these unfair and deceptive trade practices in connection with offering for sale or selling consumer goods or services in violation of Md. Comm. Code § 13-303.

146. Defendants' representations and omissions were material because they were likely to deceive reasonable consumers.

147. Defendants intended to mislead Plaintiff Olson and the Maryland Class Members and induce them to rely on their misrepresentations and omissions.

148. Defendants should have disclosed the Defect to Plaintiff Olson and the Maryland Class because they were in a superior position to know the true facts related to the Defect, and Plaintiff Olson and Class Members could not reasonably be expected to learn or discover the true facts related to this Defect.

149. Defendants, by the conduct, statements, and omissions described above, also knowingly and intentionally concealed from Plaintiff Olson and the Maryland Class Members that Class Vehicles suffer from the Defect (and the costs, safety risks, and diminished value of the Class Vehicles as a result of this problem).

150. These acts and practices have deceived Plaintiff Olson and are likely to deceive the public. Defendants, by the conduct, statements, and omissions described above, and by knowingly and intentionally concealing from Plaintiff Olson and the Maryland Class Members that the Class Vehicles suffer from the Defect (and the costs, safety risks, and diminished value of the Class Vehicles as a result of this problem), breached their duties to disclose these facts, violated the Maryland Consumer Protection Act, and caused injuries to Plaintiff Olson and the Maryland Class Members. The omissions and acts of concealment by Defendants pertained to information that was material to Plaintiff Olson and Class Members, as it would have been to all reasonable consumers.

151. The injuries suffered by Plaintiff Olson and the Maryland Class Members are greatly outweighed by any potential countervailing benefit to consumers or to competition, nor are they injuries that Plaintiff Olson and the Class Members should have reasonably avoided.

152.    Defendants' conduct proximately caused injuries to Plaintiff Olson and other Class Members. Had Plaintiff Olson and the Class known about the defective nature of the Class Vehicles, they would not have purchased the Class Vehicles, would have paid less for them, or would have avoided the extensive repair costs associated therewith.

153.    Plaintiff Olson and the Maryland Class Members seek all monetary and non-monetary relief allowed by law, including damages, disgorgement, injunctive relief, and attorneys' fees and costs.

**SECOND CAUSE OF ACTION**
**VIOLATIONS OF THE MASSACHUSETTS CONSUMER PROTECTION LAW**
**(Mass. Gen. Laws Ann. ch. 93A** *et seq.***)**
**(On Behalf of the Massachusetts Class)**

154.    Plaintiffs and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

155.    Plaintiff Gastall brings this claim individually and on behalf of the Massachusetts Class.

156.    The Massachusetts Consumer Protection Law, Mass. Gen. Laws Ann. ch. 93A, § 2 (the "Act"), declares unlawful unfair or deceptive acts or practices in the conduct of any trade or commerce.

157.    Plaintiff Gastall is a "person" as defined in the Act.

158.    Defendants engage in "trade" and/or "commerce" as defined in the Act.

159.    In the course of Defendants' business, they knowingly and intentionally failed to disclose and/or concealed the existence of the Defect in the Class Vehicles in connection with the advertisement, marketing, and sale of the Class Vehicles.

160.    Defendants had actual knowledge of the Defect in the Class Vehicles and thus had a duty to disclose the Defect to Plaintiff Gastall and the Massachusetts Class Members.

161.    Defendants failed to disclose and/or actively concealed the Defect from Plaintiff Gastall and the Massachusetts Class.

162.    Defendants knew that knowledge of the existence of the Defect in the Class Vehicles was material and that Plaintiff Gastall and the Massachusetts Class Members would reasonably rely on such information.

163.    Defendants' unfair and deceptive practices were done to profit from the sale of the Class Vehicles to the detriment of Plaintiff Gastall and the Class.

164.    As set forth above, Defendants' actions and inactions occurred in the conduct of trade or commerce and constitute unfair and/or deceptive trade practices under the Act.

165.    Plaintiff Gastall and the Massachusetts Class relied upon and were deceived by Defendants' unfair and deceptive misrepresentations and/or omissions of material fact in deciding to purchase the Class Vehicles.

166.    These acts and practices have deceived Plaintiff Gastall and are likely to deceive the public. Defendants, by the conduct, statements, and omissions described above, and by knowingly and intentionally concealing from Plaintiff Gastall and the Massachusetts Class Members that the Class Vehicles suffer from the Defect (and the costs, safety risks, and diminished value of the Class Vehicles as a result of this problem), breached their duties to disclose these facts, violated the Massachusetts Consumer Protection Law, and caused injuries to Plaintiff Gastall and the Massachusetts Class Members. The omissions and acts of concealment by Defendants pertained to information that was material to Plaintiff Gastall and Class Members, as it would have been to all reasonable consumers.

167.    Defendants' conduct proximately caused injuries to Plaintiff Gastall and other Class Members. Had Plaintiff Gastall and the Massachusetts Class known about the defective

nature of the Class Vehicles, they would not have purchased the Class Vehicles, would have paid less for them, or would have avoided the extensive repair costs associated therewith.

168.    Plaintiff Gastall and the Massachusetts Class Members seek all monetary and non-monetary relief allowed by law, including damages, disgorgement, injunctive relief, and attorneys' fees and costs.

169.    Pursuant to Mass. Gen. Laws Ann. ch. 93A § 9, Plaintiff Gastall and the Massachusetts Class are entitled to an award of reasonable legal fees and costs incurred in connection with this action.

**THIRD CAUSE OF ACTION**
**VIOLATIONS OF THE VIRGINIA CONSUMER PROTECTION ACT**
**(Va. Code Ann. § 59.1-196 *et seq.*)**
**(On Behalf of the Virginia Class)**

170.    Plaintiffs and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

171.    Plaintiff Briggs brings this claim individually and on behalf of the Virginia Class.

172.    Defendants are "suppliers" as defined in Va. Code Ann. § 59.1-198.

173.    Defendants' acts which are the basis for this lawsuit constitute "consumer transactions" as defined in Va. Code Ann. § 59.1-198.

174.    Defendants engaged in unfair and deceptive acts in violation of the Virginia Consumer Protection Act by the practices described above, and by knowingly and intentionally concealing from Plaintiff Briggs and the Virginia Class Members that the Class Vehicles are defective. These acts and practices violate, at a minimum, the following sections of Virginia's Consumer Protection Act in that Defendants:

> (A)(5) Misrepresent that goods or services have certain quantities, characteristics, ingredients, uses, or benefits;

(A)(6) Misrepresent that goods or services are of a particular standard, quality, grade, style, or model; and

(A)(8) Advertise goods or services with intent not to sell them as advertised, or with intent not to sell at the price or upon the terms advertised.

175.    Defendants knew that the Class Vehicles were defective in that the head gasket and cylinder head contained within the Class Vehicles would prematurely fail, that the failure would render the Class Vehicles inoperable and unsafe for driving, and that the necessary repairs to fix the Defect would not be covered under warranty and thus the out-of-pocket expenses to consumers would be costly.

176.    Defendants were under a duty to Plaintiff Briggs and the Virginia Class to disclose the defective nature of the Class Vehicles because:

   a.   Defendants were in a superior position to know the true state of facts about the Defect in the Class Vehicles;

   b.   Plaintiff Briggs and the Virginia Class could not reasonably have been expected to learn or discover that the Class Vehicles were defective and not in accordance with Defendants' advertisements and representations;

   c.   Defendants knew that Plaintiff Briggs and the Virginia Class could not reasonably have been expected to learn or discover the Defect in the Class Vehicles; and

   d.   Defendants actively concealed and failed to disclose the Defect from Plaintiff Briggs and the Virginia Class.

177.    Defendants actively concealed and failed to disclose the Defect from Plaintiff Briggs and the Virginia Class.

178.    Plaintiff Briggs and the Virginia Class reasonably relied upon Defendants'

misrepresentations and/or omissions related to the Class Vehicles, as would any reasonable consumer.

179.    In failing to disclose the Defect contained within the Class Vehicles at the time of sale, Defendants have knowingly and intentionally concealed material facts and breached their duty not to do so.

180.    Plaintiff Briggs and the Virginia Class Members' injuries were proximately caused by Defendants' fraudulent and deceptive business practices. Had Plaintiff Briggs known of the defective nature of the Class Vehicles, she would not have purchased her Class Vehicle or would have paid substantially less for it, and would have avoided the costly repairs associated therewith.

181.    Defendants' violations of Virginia's Consumer Protection Act have caused Plaintiff Briggs and Virginia Class Members actual damages.

182.    Plaintiff Briggs and Virginia Class Members seek actual damages and/or equitable relief, attorneys' fees and costs, and to enjoin Defendants on the terms that the Court considers reasonable.

## FOURTH CAUSE OF ACTION
### VIOLATIONS OF WISCONSIN'S DECEPTIVE TRADE PRACTICES ACT (DTPA)
(Wis. Stat. §§ 100.18, *et seq.*)
(On Behalf of the Wisconsin Class)

183.    Plaintiffs and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

184.    Plaintiff Miller brings this claim on behalf of himself and on behalf of the Wisconsin Class.

185.    The Deceptive Trade Practices Act prohibits a company from making false, deceptive, or misleading advertisements to the public, which are designed to sell the company's products. The statute states in pertinent part:

[N]o person, firm, corporation or association, . . . with intent to sell, distribute, increase the consumption of or in any wise dispose of any . . . merchandise . . . or anything offered by such person, firm, corporation or association, . . . directly or indirectly, to the public for sale, hire, use or other distribution, or with intent to induce the public in any manner to enter into any contract or obligation relating to the purchase, sale, hire, use or lease of any . . . merchandise, . . . shall make, publish, disseminate, circulate, or place before the public, or cause, directly or indirectly, to be made, published, disseminated, circulated, or placed before the public, in this state, . . . an advertisement, announcement, statement or representation of any kind to the public relating to such purchase, sale, hire, use or lease of such . . . merchandise, . . . or to the terms or conditions thereof, which . . . contains any assertion, representation or statement of fact which is untrue, deceptive or misleading.

Wis. Stat. § 100.18(1).

186.    In promoting the Class Vehicles to the public, Defendants engaged in a multi-faceted advertising campaign through their website, Ownership Manuals, dealers' websites, and other marketing materials, to Plaintiffs and other members of the Wisconsin Class, through which Defendants touted that the Class Vehicles and the parts were powerful, efficient, and reliable.

187.    Defendants' advertising and marketing materials were disseminated to consumers throughout the United States, including in Wisconsin to Plaintiff Miller and the Wisconsin Class.

188.    For example, Defendants' brochures are distributed to their authorized dealerships located throughout Wisconsin, which are then used to promote the sale and lease of the Class Vehicles.

189.    Likewise, Defendants' consumer-facing website is viewable with a click of a button to any prospective purchaser; consumers are then directed by Defendants to a specific authorized dealer to buy the Class Vehicles.

190.    As detailed above, pursuant to this marketing campaign, prospective consumers are led to believe that the head gasket and engine contained in the Class Vehicles would last.

191.    Defendants' misrepresentations and omissions concerning the Cylinder Head Defect are ostensibly false and misleading.

192.    Defendants knew or should have known that their misrepresentations and omissions were false based on their knowledge of the Defect and quality control measures, described herein.

193.    Plaintiff Miller nor other members of the Wisconsin Class would have purchased the Class Vehicles had Defendants disclosed the Defect.

194.    Accordingly, Plaintiff Miller and the Wisconsin Class—as members of the public to whom these false, deceptive, and misleading advertisements were directed—have suffered monetary damages that are recoverable under Section 100.18(1) in an amount to be determined at trial.

## FIFTH CAUSE OF ACTION
### VIOLATIONS OF WISCONSIN'S DECEPTIVE TRADE PRACTICES ACT (DTPA) & WISCONSIN'S DIRECT MARKETING REGULATION (ATCP 127)
### (Wis. Stat. § 100.20, *et seq.* & Wis. Admin. Code ATCP §§ 127.01 *et seq.*)
### (On Behalf of the Wisconsin Class)

195.    Plaintiffs and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

196.    Plaintiff Miller brings this claim individually and on behalf of the Wisconsin Class.

197.    The DTPA prohibits individuals and entities from engaging in unfair trade practices in Wisconsin. Wis. Stat. § 100.20(1). To that end, Section 100.20 authorizes the Wisconsin Department of Agriculture, Trade and Consumer Protection ("DATCP") to "issue general orders forbidding methods of competition in business or trade practices in business which are determined by the [DATCP] to be unfair." § 100.20(2)(a).

198.    The statute vests any person who suffers pecuniary loss stemming from a violation of "any order issued under [Section 100.20]" with a cause of action to sue for damages in a court of competent jurisdiction. § 100.20(5).

199.    Relevant here, Chapter ATCP 127 of Wisconsin's Administrative Code specifies

the conduct to which a "seller" of "consumer goods and services" must adhere when making face-to-face solicitations with customers. *See* Wis. Admin. Code ATCP §§ 127.01 *et seq.*

200.    Defendants are "sellers" because they are engaged in the business of selling, offering to sell, and/or promoting the sale of consumer goods or services to consumers. § 127.01(21).

201.    Defendants promote the sale of the Class Vehicles by disseminating brochures and other advertising materials as alleged herein to their authorized dealers throughout the United States, including those dealers located in the state of Wisconsin.

202.    Plaintiff Miller and Wisconsin Class Members are "consumer[s]" as the term is defined in ATCP 127 because they are individuals to whom Defendants advertised, offered to sell, sold, and/or promoted the sale of consumer goods or services. § 127.01(2).

203.    The Class Vehicles are "consumer goods" because they are goods used for personal, family, or household purposes. § 127.01(3).

204.    ATCP 127 was adopted under the authority of Section 100.20(2) and is enforceable through a private right of action pursuant to Section 100.20(5). Thus, Plaintiff Miller may enforce the mandates of ATCP 127 by way of a Section 100.20(5) claim on behalf of himself and members of the Wisconsin Class.

205.    As "sellers" of the Class Vehicles, Defendants were required to "disclose" to Plaintiff Miller: "all material terms and conditions affecting the sale, receipt, or use of the consumer goods or services, including credit terms if any." § 127.64(1)(c).

206.    The ATCP defines "disclose" as: "to make a clear and conspicuous statement which is reasonably designed to be noticed and readily understood by the consumer." § 127.01(10).

207.    ATCP 127 defines a "face-to-face solicitation" as a solicitation that "a seller makes

54

in a face-to-face encounter with a consumer," including "[p]urchase contracts and other dealings that result from a face–to–face solicitation." § 127.60.

208.    A "solicitation" is defined as "a communication received by a consumer at a place other than the seller's regular place of business, in which a seller offers or promotes the sale of consumer goods or services to a consumer, or which is part of a seller's plan or scheme to sell consumer goods or services to a consumer." § 127.01(22).

209.    ATCP 127 prohibits Defendants from engaging in the following misconduct when making a "face-to-face solicitation":

a.  failing to disclose material costs payable by the consumer;

b.  misrepresenting the nature, quantity, material characteristics, performance, or efficacy of the goods or services offered or promoted;

c.  failing to disclose material restrictions, limitations, or conditions on the purchase, receipt, use, or return of goods of services offered or promoted;

d.  misrepresenting the material terms of their warranty policies; and

e.  making any false, deceptive, or misleading representations to consumers.

§§ 127.72(4)–(7), (15).

210.    Defendants make face-to-face solicitations any time a consumer buys or leases a Class Vehicle at one of Wisconsin's authorized dealerships because there is a face-to-face encounter that takes place outside of Defendants' respective places of business, whereby Defendants, as sellers, promote the sale or lease of Class Vehicles through the brochures and/or other advertising materials their authorized dealers provide the consumer on Defendants' behalf.

211.    Defendants disseminated brochures and/or other advertising materials promoting the sale or lease of Class Vehicles to their authorized dealers across the United States, including

those located in the state of Wisconsin.

212.    As explained above, the Class Vehicles contain the Defect.

213.    Before Plaintiff Miller and members of the Wisconsin Class entered their respective purchase contracts, however, Defendants failed to conspicuously disclose in writing all material terms and conditions affecting their use of the Class Vehicles; specifically, at no point did Defendants inform Plaintiff Miller or members of the Wisconsin Class that the Class Vehicles contain a Cylinder Head Defect, which would cause them to prematurely fail.

214.    Defendants' failure to disclose this information violated ATCP § 127.64(1)(c) because the Defect constitutes as "material terms and conditions affecting the sale, receipt, or use" of the Class Vehicles. Indeed, not only is this information material to any prospective purchaser, but as a result of the Defect, Plaintiff Miller and the Wisconsin Class have been (or will be) deprived of the use of the Class Vehicles whenever the Defect manifests.

215.    Additionally, Defendants violated several provisions of ATCP § 127.72, because they:

   a.    failed to disclose material costs for which the Plaintiffs and Class Members would ultimately be responsible when the Defect manifests;

   b.    misrepresented the nature, material characteristics, performance, or efficacy of the Class Vehicles as it relates to the head gasket and/or the engine;

   c.    failed to disclose material restrictions, limitations, or conditions on the use of the Class Vehicles they promoted;

   d.    misrepresented the material terms of their warranty policy, which Defendants claim does not cover damages stemming from the Defect; and

   e.    made false, deceptive, or misleading representations to Plaintiff Miller and the

Wisconsin Class as described above.

216.     As a result of Defendants' violations of ATCP 127, Plaintiff Miller and the Wisconsin Class have suffered pecuniary loss, including but not limited to overpaying for the Class Vehicles, out-of-pocket costs associated with the Defect, and/or the diminution in value of the Class Vehicles.

217.     Accordingly, Plaintiff Miller and the Wisconsin Class bring this claim through their authority under Wis. Stat. § 100.20 and seek recovery for the losses suffered—in addition to the other remedies set forth under this statute, including exemplary damages and attorneys' fees—in an amount to be determined at trial.

<u>second CAUSE OF ACTION</u>
**BREACH OF EXPRESS WARRANTY**
**(On Behalf of the Nationwide Class Or, Alternatively, the State Classes)**

218.     Plaintiffs and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

219.     Plaintiffs bring this cause of action on behalf of themselves and the Class against all Defendants, or in the alternative, on behalf of the State Classes against all Defendants.

220.     Defendants provided Plaintiffs and Class Members with the express warranties set forth above.

221.     Specifically, Defendants warranted that the Class Vehicles were free from defects in materials or workmanship; and that in the event the Class Vehicles suffered from defects in either of these respects, Defendants would correct such defects at no cost to Plaintiffs or Class Members.

222.     The Class Vehicles were not free from defects in materials or workmanship because they suffer from the Cylinder Head Defect.

223.    Defendants have refused to and continue to refuse to comply with the terms of their warranty to correct the Defect outlined above.

224.    Plaintiffs and the Class complied with their obligations under the express warranty at all times relevant herein.

225.    As a result of Defendants' breach of express warranty, Plaintiffs and Class Members have suffered damages.

226.    Defendants' conduct was done knowingly, wantonly, maliciously, and/or in conscious disregard for the rights of Plaintiffs and the Class and/or State Classes, justifying the imposition of punitive damages.

### SEVENTH CAUSE OF ACTION
### BREACH OF IMPLIED WARRANTY
#### (On Behalf of the Nationwide Class Or, Alternatively, the State Classes)

227.    Plaintiffs and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

228.    Plaintiffs bring this cause of action on behalf of themselves and the Class against all Defendants, or in the alternative, on behalf of the State Classes against all Defendants.

229.    Defendants were at all relevant times the manufacturers, distributors, warrantors, and/or sellers of the Class Vehicles. Defendants knew or had reason to know of the specific use for which the Class Vehicles were purchased.

230.    Defendants provided Plaintiffs and the other Class Members with an implied warranty that the Class Vehicles and any parts thereof are merchantable and fit for the ordinary purposes for which they were sold. However, the Class Vehicles are not fit for their ordinary purpose of providing reasonably reliable and safe transportation at the time of sale or thereafter because, *inter alia*, the Class Vehicles suffer from the Cylinder Head Defect, which causes the

vehicles to experience premature and catastrophic engine failure. Therefore, the Class Vehicles are not fit for their particular purpose of providing safe and reliable transportation.

231. Defendants impliedly warranted that the Class Vehicles were of merchantable quality and fit for such use. This implied warranty included, among other things: (i) a warranty that the Class Vehicles and their engines were manufactured, supplied, distributed, and/or sold by Defendants were safe and reliable for providing transportation and would not experience premature and catastrophic engine failure; and (ii) a warranty that the Class Vehicles and their engines would be fit for their intended use while the Class Vehicles were being operated.

232. Contrary to the applicable implied warranties, the Class Vehicles and their engines at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing Plaintiffs and the Class Members with reliable, durable, and safe transportation. Instead, the Class Vehicles suffer from manufacturing and/or design defects.

233. Defendants' actions, as complained of herein, breached the implied warranty that the Class Vehicles were of merchantable quality and fit for such use.

**EIGHTH CAUSE OF ACTION**
**VIOLATION OF THE MAGNUSON-MOSS WARRANTY ACT**
**(15 U.S.C. §§ 2301, *et seq.*)**
**(On Behalf of the Nationwide Class Or, Alternatively, the State Classes)**

234. Plaintiffs and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

235. Plaintiffs bring this cause of action on behalf of themselves and the Class against all Defendants, or in the alternative, on behalf of the State Classes against all Defendants.

236. Plaintiffs and the Class are "consumers" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3).

237. Defendants are suppliers and warrantors within the meaning of 15 U.S.C.

§§ 2301(4)-(5).

238.    The Class Vehicles are "consumer products" within the meaning of 15 U.S.C. §
2301(1).

239.    The warranties described above are "written warranties" within the meaning of 15
U.S.C. § 2301(6).

240.    Defendants breached the express warranties by:

    a.   Providing warranties with the purchase or lease of the Class Vehicles, thereby
warranting to repair or replace any part defective in material or workmanship
at no cost to the owner or lessee;

    b.   Selling and leasing Class Vehicles that were defective in materials, design,
and/or workmanship, requiring repair or replacement within the warranty
period; and

    c.   Refusing and/or failing to honor the express warranties by repairing or
replacing, free of charge, the component parts in order to remedy the Cylinder
Head Defect.

241.    Plaintiffs and the Class relied on the existence and length of the express warranties
in deciding whether to purchase or lease the Class Vehicles.

242.    Defendants' breach of the express warranties has deprived Plaintiffs and the Class
of the benefit of their bargain.

243.    The amount in controversy of Plaintiffs' individual claims meets or exceeds the
sum or value of $25.00. In addition, the amount in controversy meets or exceeds the sum or value
of $50,000 (exclusive of interests and costs) computed on the basis of all claims to be determined
in this suit.

244.     Defendants have been afforded a reasonable opportunity to cure their breach of the written warranties and/or Plaintiffs and the other Class Members were not required to do so because affording Defendants a reasonable opportunity to cure their breach of written warranties would have been futile. Defendants were also on notice of the alleged Defect from the complaints and service requests they received from Class Members, as well as from their own warranty claims, customer complaint data, and/or parts sales data.

245.     As a direct and proximate cause of Defendants' breach of the written warranties, Plaintiffs and the other Class Members sustained damages and other losses in an amount to be determined at trial. Defendants' conduct damaged Plaintiffs and the other Class Members, who are entitled to recover actual damages, consequential damages, specific performance, diminution in value, costs, including statutory attorney fees and/or other relief as deemed appropriate.

## NINTH CAUSE OF ACTION
### FRAUDULENT CONCEALMENT
**(On Behalf of the Nationwide Class Or, Alternatively, the State Classes)**

246.     Plaintiffs and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

247.     Plaintiffs bring this cause of action on behalf of themselves and the Class against all Defendants, or in the alternative, on behalf of the State Classes against all Defendants.

248.     At all relevant times, Defendants were engaged in the business of designing, manufacturing, distributing, and selling the Class Vehicles.

249.     Defendants, acting through its representatives or agents, sold and/or leased the Class Vehicles throughout the United States.

250.    Defendants willfully, falsely, and knowingly omitted various material facts regarding the quality and character of the Class Vehicles, including that they suffered from the Cylinder Head Defect.

251.    Rather than inform consumers of the truth regarding the Cylinder Head Defect, Defendants concealed material information related to the Cylinder Head Defect.

252.    Defendants' omissions were material because the Cylinder Head Defect has a substantial impact not simply on the convenience and cost of vehicle maintenance, but also on the reliability and safety of the Class Vehicles over time.

253.    Defendants omitted this material information to drive up sales and maintain their market power, as consumers would not have purchased the Class Vehicles, or would have paid substantially less for them, had they known the truth.

254.    Plaintiffs and the Class Members had no way of knowing about the Cylinder Head Defect.

255.    Plaintiffs and Class Members could not have discovered the above information on their own, because Defendants were in the exclusive possession of such information.

256.    Although Defendants have a duty to ensure the accuracy of information regarding the performance of its Class Vehicles, they did not fulfill these duties.

257.    Plaintiffs and Class Members sustained injury due to the purchase of Class Vehicles that suffered from the Cylinder Head Defect.

258.    Defendants' acts were done maliciously, oppressively, deliberately, and with intent to defraud, and in reckless disregard of Plaintiffs and Class Members' rights and well-being, and in part to enrich themselves at the expense of consumers. Defendants' acts were done to gain commercial advantage over competitors, and to drive consumers away from consideration of

competitor's vehicles. Defendants' conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future.

## TENTH CAUSE OF ACTION
### UNJUST ENRICHMENT
**(On Behalf of the Nationwide Class Or, Alternatively, the State Classes)**

259.    Plaintiffs and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

260.    Plaintiffs bring this cause of action on behalf of themselves and the Class against all Defendants, or in the alternative, on behalf of the State Classes against all Defendants.

261.    This claim is pled in the alternative to Plaintiffs' contract-based claims.

262.    Defendants knew or should have known that Plaintiffs and the Class paid for the Class Vehicles with the expectation that they would perform as represented and were free from defects.

263.    Plaintiffs and the Class conferred substantial benefits on Defendants by purchasing the defective Class Vehicles. Defendants knowingly and willingly accepted and enjoyed those benefits.

264.    Defendants' retention of these benefits is inequitable.

265.    As a direct and proximate cause of Defendants' unjust enrichment, Plaintiffs and the Class are entitled to an accounting, restitution, attorneys' fees, costs, and interest.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of members of the Classes defined above, respectfully request that the Court enter judgment against Defendants and award the following relief:

A.     Certification of this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, declaring Plaintiffs as the representatives of the Classes, and Plaintiffs' counsel as counsel for the Classes;

B.     An order enjoining Defendants from continuing the unlawful, deceptive, fraudulent, and unfair business practices alleged in this Complaint, including, without limitation, an order that requires Defendants to:

      i.     repair, recall, and/or replace the Class Vehicles,

      ii.     extend the applicable warranties to a reasonable period of time and to so notify the Classes,

      iii.     stop selling Class Vehicles with the misleading information and omissions and Cylinder Head Defect, and

      iv.     provide Plaintiffs and Class Members with appropriate curative notice regarding the existence and cause of the Cylinder Head Defect;

C.     An order granting declaratory relief, including without limitation, a declaration:

      i.     requiring Defendants to comply with the various provisions of law cited above and to make all required disclosures; and

      ii.     stating that Defendants are financially responsible for all Class notice and the administration of Class relief;

D.     An award of appropriate damages to repair or replace the Class Vehicles, including damages for economic loss including loss of the benefit of the bargain, overpayment damages, diminished value, and out-of-pocket losses;

E.     An order requiring disgorgement, for the benefit of the Class, the ill-gotten profits Defendants received from the sale or lease of the Class Vehicles, or full restitution to Plaintiffs and members of the Classes;

F.     An order awarding any applicable statutory damages, civil penalties, and punitive and exemplary damages;

G.     An award of costs, expenses, and attorneys' fees;

H.     An order requiring Defendants to pay both pre- and post-judgment interest on any amounts awarded; and

I.     Such other or further relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury on all issues so triable.

Dated: February 28, 2025

Respectfully submitted,

*/s/ Matthew D. Schelkopf*
Matthew D. Schelkopf
Joseph B. Kenney
Juliette T. Mogenson
**SAUDER SCHELKOPF LLC**
1109 Lancaster Avenue
Berwyn, PA 19312
Tel: (610) 200-0581
mds@sstriallawyers.com
jbk@sstriallawyers.com
jtm@sstriallawyers.com

*Attorneys for Plaintiffs and the putative Class*